**FIRST FEDERAL OF MICHIGAN, City of Detroit, et al., Defendants,**

**City of Detroit (86–1855/87–1402), Manufacturers National Bank of Detroit (87–1414), Defendants–Appellants,**

**v.**

**Thomas J. BARROW, Trustee, Plaintiff–Appellee.**

**Nos. 86–1855, 87–1402 and 87–1414.**

United States Court of Appeals, Sixth Circuit.

Argued March 1, 1988.

Decided June 16, 1989.

Peter W. Macuga, Mary Richman (argued), City of Detroit Law Dept., Michael D. Boutell, Michael R. Main, Detroit Mich., for defendants-appellants.

Thomas J. Barrow, Detroit, Mich., pro se.

Wright W. Blake, Detroit, Mich., John B. Kemp (argued), Francis C. Flood, James C. Steffl, Kemp, Klein, Endelman & Beer, Birmingham, Mich., for plaintiff-appellee.

Before ENGEL, Chief Judge *; and MERRITT and KRUPANSKY, Circuit Judges.

KRUPANSKY, Circuit Judge.

Defendants-appellants,[1] two certified classes of creditors, appealed from the district court's decision affirming the bankruptcy court's determination which mandated the repayment of certain avoidable preferential transfers to the bankrupt estate in this proceeding commenced by Thomas J. Barrow (Trustee), the trustee of the bankruptcy estate, to recover such payments. The record disclosed the following facts.

Salem Mortgage Company, Fidelity Fund, Inc., Fidelity Securities Corp., Nationwide Mortgage Co., Inc., and Mutual Mortgage Company (collectively referred to as debtors), were individual corporations engaged in the business of mortgage investments. Joseph Steingold (Steingold) was the principal shareholder and chief operating officer of each corporation. For purposes of this appeal, the businesses of the debtor corporations are considered collectively as a single enterprise with Steingold, its motivating force, acting through his principal alter ego Salem Mortgage Company (Salem) at the hub of the operation.

The underlying concept of the enterprise was simply to match interested property owners and available lenders for the purpose of arranging or coordinating a loan between the parties evidenced by a personal note secured by a real estate mortgage which was, pursuant to a collateral agreement with the investor, to be serviced by Salem for a fee based upon the amount of the monthly mortgage payment.

Ostensibly, interested property owners, upon being matched with interested lenders/investors by a debtor corporation, would execute a personal note secured by a real estate mortgage to the debtor corporation which would assign the note and mortgage to the appropriate investor who funded the loan. Pursuant to a loan servicing agreement contemporaneously executed by the investor, Salem would collect the monthly installment mortgage payments including the principal and interest payable on the note, $1/12$ of the annual hazard insurance premium, $1/12$ of the annual property taxes, $1/12$ of any accrued annual property assessment, together with accrued "wrap around" payments against a first mort-

---

* The Honorable Albert J. Engel assumed the duties of Chief Judge effective April 1, 1988.

1. Defendants-appellants were first mortgage holders and taxing authorities. Before this court, the first mortgage holders were represented by the Manufacturers National Bank of Detroit and the taxing authorities were represented by the City of Detroit, and will be collectively referred to as "appellants."

gage, if one existed. The monthly mortgage receipts were purportedly segregated and deposited into individual escrow accounts from which disbursements were to be allocated and paid to the appropriate principal, i.e., taxing authority, insurance carrier, first mortgagee, if any, and the appropriate investor at designated regular intervals after deduction of the service charge.

In reality, however, at least from early 1982, when debtors' cash flow became critical, to the date of the bankruptcy proceedings, the debtors' modus operandi experienced calculated radical changes. The concept of depositing mortgage receipts into segregated bank accounts, from which disbursements were made to appropriate principals, was abandoned. Thereafter, all monies received by the debtors, including investor loan advances, mortgage payments, rental payments, and debtor cash receipts from a variety of miscellaneous sources were deposited and commingled in a Salem zero balance Depository Account.[2] The commingled funds in the Depository Account were, on a daily basis, automatically transferred into the Salem Mortgage Company Central Account (Central Account) where the newly deposited funds were again commingled with existing cash balances in that central account. The Central Account was the reservoir from which funds were automatically transferred into various other Salem zero balance checking accounts, including but not limited to the Servicing Account, Mortgage Account, and Payroll Account, to honor payment of any checks that had been written on any of those accounts. Accordingly, at the end of each business day, Salem's Depository Account, its Servicing Account, its Mortgage Account, its Payroll Account, and all similar accounts were zero balanced.

As Salem's cash flow became progressively more precarious in late 1982 and early 1983, immediately preliminary to its bankruptcy proceedings, the reservoir Salem Central Account consistently reflected five figure negative balances as a result of cascading cash demands and overdrafts. As a result, sums deposited into that account from whatever source continued to be commingled and suffered an irretrievable loss of identity since the available cash balances in the consistently overdrawn Central Account at any given time were used to honor outstanding checks issued to satisfy obligations incurred during previous days, weeks, or months. The record further disclosed that for at least ninety days immediately preceding the March 30, 1983 filing date of the petition for bankruptcy, and probably for some time prior thereto, Salem, motivated by its self interest, was disbursing its commingled funds from the Central Account to certain favored creditors and appellants herein on behalf of selective investors.

The debtors filed a petition for Chapter 11 reorganization in the Bankruptcy Court for the Eastern District of Michigan on March 30, 1983. On August 4, 1984, the trustee commenced the present action to recover funds paid to investors, first mortgage holders, taxing authorities, insurance carriers and insurance agencies within ninety days prior to the filing of the petition, pursuant to Bankruptcy Rule 7023.[3]

On September 16, 1985, subsequent to oral arguments on the cross motions of the parties for summary judgment, the Bankruptcy Court concluded that the payments here at issue were avoidable preferential transfers within the dictates of 11 U.S.C. § 547(a) and therefore subject to recovery by the trustee pursuant to 11 U.S.C. § 550(a).

Thereafter, the insurance companies and insurance agencies negotiated a settlement of the trustee's claims and the taxing authorities and first mortgage holders pursued a timely appeal to the United States District Court for the Eastern District of

---

**2.** Zero balance accounts are open accounts without cash balances which are designed to maximize the viability of idle investment capital by affording a system of automatic inter-account fund transfers from a central account to subsidiary accounts on an "as needed" basis.

**3.** The Chapter 11 reorganization was converted into a Chapter 7 liquidation bankruptcy proceeding on November 19, 1985.

Michigan. The appellants collectively charged that the district court erred in concluding that the payment of accrued taxes and mortgage payments were avoidable preferences because the payments were made from funds collected by virtue of Salem's servicing contracts with its investors that were held in constructive trust for disbursement to appropriate beneficiaries, i.e. first mortgagees and taxing authorities; that the transfers were not made for or on account of an antecedent debt owed by Salem; that the transfers did not enable the appellants to receive more than similarly situated creditors would have received had the case proceeded pursuant to Chapter 7 of this title; and that the payments were not exempted preferences authorized within the ordinary course of business exception of 11 U.S.C. § 547(c)(2).

■ Initially, it is noted that the predicate for the trust doctrine as applied in bankruptcy is a perpetuated integrity of the trust properties so as to avoid conflict with and between creditor classes; consequently, this court's attention is directed to 4 L. King *Collier on Bankruptcy*, ¶ 541.13, at 541–78—541–79 (15th ed. 1988) wherein the doctrine, as applied within the majority of the circuits, is discussed:

> Once the trust relationship has been established, one claiming as a cestui que trust thereunder must identify the trust fund or property in the estate, and, if such fund or property has been mingled with the general property of the debtor, sufficiently trace the trust property. If the trust fund or property cannot be identified in its original or substituted form, the cestui becomes merely a general creditor of the estate.

*Id.* (footnotes omitted).

■ Accordingly, having asserted a constructive trust of which they were beneficiaries, the appellants assumed the burden of identifying the sums of their entitlements by tracing the trust funds through Salem's commingled accounts. It is equally clear that the Bankruptcy Act of 1978 explicitly defined the order of creditor priority and declared the congressional intent of federal supremacy over declared but conflicting state law orders of priority. *See, e.g., Danning v. Bozek (In re Bullion Reserve of North America),* 836 F.2d 1214 (9th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988); *In re Kennedy & Cohen, Inc.,* 612 F.2d 963 (5th Cir.), *cert. denied,* 449 U.S. 833, 66 L.Ed.2d 38 (1980); *Gulf Petroleum v. Collazo,* 316 F.2d 257 (1st Cir.1963); *Elliott v. Bumb,* 356 F.2d 749 (9th Cir.), *cert. denied,* 385 U.S. 829, 87 S.Ct. 67, 17 L.Ed.2d 66 (1966).

To support their constructive trust theory of recovery and to avoid their burden of tracing the controversial payments received from the commingled Salem Central Account immediately prior to commencement of the bankruptcy proceedings, the appellants have relied primarily upon this circuit's pronouncements in *Selby v. Ford Motor Company,* 590 F.2d 642 (6th Cir. 1979). Appellants' argument is misplaced and *Selby* is easily distinguished from the instant case in that "tracing" within the context of "commingled funds" was not an issue that was joined, addressed, considered, or discussed in that disposition. It is beyond peradventure that, as a general rule, any party seeking to impress a trust upon funds for purposes of exemption from a bankrupt estate must identify the trust fund in its original or substituted form. *Danning,* 836 F.2d at 1218; *Elliott,* 356 F.2d at 754. In the instant case, appellants have not attempted to trace their funds beyond the deposits into the commingled Salem Central Account, which evidence, standing alone, is insufficient to support their constructive trust theory of recovery. Since the purported constructive trust consisted of money, which had no extrinsic identifiable characteristics of its own, that was initially deposited and commingled into the Salem Depository Account with unidentifiable funds received from innumerable and diverse other sources and daily redeposited and again commingled in the negative balance Salem Central Account, appellants' funds irretrievably lost their identity and "tracing" became a futile pursuit as a result of which the controversial payments here in issue became avoidable transfers within the meaning of 11 U.S.C. § 547(b)

and 550(a). *Drabkin v. District of Columbia,* 824 F.2d 1102 (D.C.Cir.1987).

Moreover, Salem's escalating cash deficits, and its consistently overdrawn Central Account, presented a classic textbook testament to the immutable anonymity of the erroneously styled trust funds when measured against the logic of the "lowest intermediate balance test" as discussed in Collier on Bankruptcy:

> The situation frequently occurs where trust funds have been traced into a general bank account of the debtor. The following general principles have been applied. The bankruptcy court will follow the trust fund and decree restitution where the amount of the deposit has at all times since the intermingling of funds equaled or exceeded the amount of the trust fund. But where, after the appropriation and mingling, all of the moneys are withdrawn, the equity of the cestui is lost, although moneys from other sources are subsequently deposited in the same account. In the intermediate case where the account is reduced to a smaller sum than the trust fund, the latter must be regarded as dissipated, except as to the balance, and funds subsequently added from other sources cannot be subject to the equitable claim of the cestui que trust. If new money is deposited before the balance is reduced, the reduction should be considered to be from the new money and not from the monies held in trust. This analysis may be referred to as the lowest intermediate balance test.

4 L. King *Collier on Bankruptcy,* ¶ 541.13, at 541–79—541–80 (15th ed. 1988) (footnote omitted). The Central Account was, from time to time, infused with bank funds advanced to honor a number, but not all, of debtor's overdrafts; current daily receipts from all sources were deposited and commingled with other unidentified cash balances; finally, all disbursements, including the selective payments to appellants, were made from the account.

The inability of the appellants to trace and identify the claimed controversial trust funds eviscerates their second argument that the debtors' fraudulent activity barred the trustee from recovering funds to which the debtors had no right or title. In *Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924), the Supreme Court stated:

> [The defendant lenders] could have followed the money wherever they could trace it and have asserted possession of it on the ground that there was a resulting trust in their favor, or they could have established a lien for what was due them in any particular fund of which [the debtor] had made it a part. These things they could do without violating any statutory rule against preference in bankruptcy, because they would then have been endeavoring to get their own money, and not money in the estate of the bankrupt. *But to succeed they must trace the money, and therein they have failed.*

*Cunningham,* 265 U.S. at 11, 44 S.Ct. at 426 (emphasis added).

> [It is a] well settled rule that property converted, embezzled, or otherwise taken by the bankrupt, or obtained by him by fraud, can be claimed from the bankrupt estate only so long as it can be definitely traced, with the consequence that an attempted repayment by the bankrupt prior to the bankruptcy is a preference.

*Morris Plan Industrial Bank of New York v. Schorn,* 135 F.2d 538, 539 (2d Cir.1943).

In *In re Independent Clearing House Co.,* 41 B.R. 985, 999 (Bkrtcy Utah 1984), *aff'd in part, rev'd in part on other grounds,* 62 B.R. 118 (D.Utah 1986), *aff'd in part, rev'd in part on other grounds en banc,* 77 B.R. 843 (D.Utah 1987), the bankruptcy judge noted:

> As to fraudulent conveyances and preferences, the trustee has the rights of a judgment creditor as well as the powers specifically conferred by the bankruptcy law. *Dudley v. Easton,* 104 U.S. (14 Otto) 99, 103, 26 L.Ed. 668 (1881). When exercising his avoiding powers the trustee is not asserting a cause of action belonging to the debtor, but is acting in a representative capacity on behalf of all

the creditors. *Fairbanks Shovel Co. v. Wills*, 240 U.S. 642, 648, 36 S.Ct. 466, 468, 60 L.Ed. 841 (1916); *In re Onondaga Litholite Co.*, 218 F.2d 671, 674, 50 A.L.R.2d 308 (2d Cir.1955); *In re McDonald*, 173 F. 99, 102 (D.Mass.1908); *In re Best Pack Seafoods, Inc.*, 29 B.R. 23, 24 (Bkrtcy.D.Me.1983).

In the exercise of such powers, the trustee enjoys greater rights than the pre-petition debtor ... Funds obtained from investors in a "Ponzi" scheme are property, and are as susceptible of preferential and fraudulent disposition as other property.

*Id.* at 999. (emphasis added).

■ This court also finds appellants' third argument that the controversial transfers here at issue were not in payment of debtors' pre-existing or antecedent debts less than persuasive.

The following Bankruptcy Code definitions are pertinent to the above-posited assignment of error:

(1) "debt" means a liability on a claim.

11 U.S.C. § 101(11).

(2) "claim" means—

(A) Right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or

(B) A right to an equitable remedy for breach or performance if such a breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

11 U.S.C. § 101(4).

(3) "creditor" means—

an entity that has a *claim* against the debtor that arose at the time of or before the order of relief concerning the debtor.

11 U.S.C. § 101(9)(A) (emphasis added).

The legislative history of the Bankruptcy Code evidences Congress' desire to provide the broadest possible definition of "claim" when it enacted Section 101(4).[4] *See Ohio v. Kovacs*, 469 U.S. 274, 279, 105 S.Ct. 705, 708, 83 L.Ed.2d 649 (1985); *Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d 1214, 1219 (9th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988).

When the debtors corrupted their fiduciary duties and abandoned their responsibility as agent for the investors to properly service the mortgagors' indebtedness to the taxing authorities, superior mortgagees, and the investors with identifiable funds from appropriately segregated escrow accounts and elected to implement banking practices and procedures that were calculated to facilitate the manipulation, diversion and misappropriation of collected mortgage payments, they realigned the configuration of certain debtor/creditor relationships.

Initially, the monthly payments collected in trust from the mortgagors, including the pro rata amounts for the superior mortgages, taxes, hazard insurance and investors which had originally been held in trust for the mortgagors in appropriately segregated escrow accounts for disbursement at designated regular intervals, i.e., monthly, quarterly, or biannually, and which were deposited into the Salem Central Account, subsequently lost their identity as a result of commingling with other unidentified debtor funds derived from numerous other miscellaneous sources and became the property of the debtors' estate. Additionally, for at least ninety days immediately preceding debtors' declaration of bankruptcy and probably for some time prior thereto when it became apparent that debtors' exploding expenses hopelessly exceeded income and the Salem Central Account consistently carried a five figure negative bal-

---

4. H.R.Rep. No. 595, 95th Cong., 2d Sess. 309, *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 6266; S.Rep. No. 989, 95th Cong., 2d Sess. 21, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5807.

ance, and when monies from that account were disbursed to honor previously issued checks in satisfaction of pre-existing indebtedness, the mortgagors as well as the appellant taxing authorities and investors were stripped of their status as beneficiaries of any trust or constructive trust that may have existed while the mortgage payments were identifiable in segregated escrow accounts and they became general creditors of the debtors and the debtors' bankrupt estate because the debtors' conversion of the mortgage payments had occurred at the moment when the identifiable funds were deposited into Salem's negative balance Central Account from which transfers were made to satisfy debtors' pre-existing indebtedness to the mortgagors and appellants. Accordingly, the appellants' charge that the transfers here in controversy were not in payment of pre-existing indebtedness must fail and the repayments to the appellants must be declared to be voidable preferences. The instant case is analogous to *Feinblatt v. Block,* 456 F.Supp. 776 (D.Md.1978), *aff'd in relevant part, modified in part, unpublished per curiam,* 605 F.2d 1201 (4th Cir.1979), wherein it was stated:

> [A] willing extension of credit is not necessary in order to create an antecedent debt under the preference provision of the [Bankruptcy] Act ... [T]o the contrary, it is a well settled rule that property converted, embezzled, or otherwise taken by the bankrupt, or obtained by him by fraud, can be claimed from the bankruptcy estate only so long as it can be definitely traced, with the consequence that an attempted repayment by the bankrupt prior to the bankruptcy is a preference, except where made from the very property taken.... *Kline's misappropriation of Block's money made him Block's debtor at the time of the misappropriation. Because Block was repaid with funds other than those taken by Kline, the payment constituted a voidable preference,* providing the other elements have been proved.

*Id.* at 780 (citations omitted) (emphasis added).

Moreover, the transfers to the appellants constituted preferential treatment in derogation of similarly situated general creditors. 11 U.S.C. § 547(b)(5) addresses transfers which permit certain creditors to receive greater monetary satisfaction than they would have received had the bankrupt estate been liquidated pursuant to Chapter 7 of this title. *Barash v. Public Finance Corp.* 658 F.2d 504 (7th Cir.1981). In the instant case, because the debtors, motivated by self interest, satisfied their outstanding indebtedness to appellants by Steingold's preferential disbursements from Salem's Central Account made within ninety days immediately preceding debtors' bankruptcy declaration and during a period when the bankrupt estate was incapable of 100% satisfaction of general creditor claims, the preference of full payment of appellants' claims is apparent.

■ This court cannot seriously consider appellants' assertions in its fourth assignment of error, characterizing the transfers here in issue as transfers made in the ordinary course of the business or financial affairs of the debtors, given the totally unorthodox and illegal manner in which debtors conducted their collective business operations during the ninety-day predeclaration period. 11 U.S.C. § 547(c)(2). *See generally Courtney v. Octopi, Inc. (In re Colonial Discount Corp.),* 807 F.2d 594, 600 (7th Cir.1986) (Payments are not in the ordinary course of business when they are the result of "pre-bankruptcy planning.").

The obviously calculated fraudulent business manipulations designed to expedite the diversion and misappropriation of the mortgagors' and appellants' monies by commingling the purported escrow funds through the Salem Central Account, which consistently had a negative balance, do not comport with ordinary course of business practices commonly pursued by properly conducted mortgage companies and/or service institutions. 11 U.S.C. § 547(c)(2)(C); *In re Magic Circle Energy Corp.,* 64 B.R. 269, 274 (Bankr.W.D.Okl.1986) ("To be objectively 'ordinary' implies that the subject transfer did not deviate from the industry norm."); *In re Steel Improvement Co.,* 79

B.R. 681, 684 (Bankr.E.D.Mich.1987) (The party claiming the ordinary business exception bears the burden of proving that the payments at issue "were consistent with ordinary course of business in the parties' industry."). This court finds no error in the bankruptcy court's conclusions as affirmed by the district court that the indebtedness incurred by the debtors, including the diversion and misappropriation of funds from the Salem Central Account to satisfy preferred creditors, was not in accordance with ordinary business practices.

■ Finally, although the district court *erroneously refused to review the bankruptcy court's exercise of discretion in certifying the defendant class pursuant to Fed.R.Civ.P. 23(b)(1), appellants' assignment of error has nevertheless been properly preserved for consideration by this court.*

An examination of the record does not, however, disclose that the bankruptcy court abused its discretion in its class certification. The operative facts support the bankruptcy court's conclusion that the defendants' class certification falls within the requirements of Rule 23(b)(1).

At the outset, it is noted that the appellants take no issue with the bankruptcy court's conclusions that the requirements of subsection (a) of Rule 23 have been satisfied. In essence, their charged error is directed to the bankruptcy court's lack of evidence to support the requisite elements of the Rule 23(b)(1) certification and its refusal to certify the identified class pursuant to Rule 23(b)(3). In the instant case, each of the certified classes included creditors of the bankrupt estate who allegedly received preferential payments from the debtors during the ninety days immediately preceding debtors' declaration of bankruptcy to the detriment of other general creditors similarly situated, which transfers the trustee sought to avoid as preferential. It is apparent from the record that the preferential treatment accorded the appellants was common to all and was initiated by debtors' motivation of self-interest in favoring certain selected creditors in an effort to perpetuate or at least prolong debtors' fraudulent enterprise.

The absence of class certification in the instant case would have precipitated a multiplicity of separate actions against the individual members of the certified classes which would have created the risk of inconsistent or varying adjudications with respect to individual class members which, in turn, would have established incompatible standards of conduct for the trustee in pursuing the classes by placing him into a possible conflict of position in seeking satisfactions of individual claims.

The class certification in the instant case not only conserved the judicial resource, but provided an efficient vehicle for achieving unitary adjudication as to all class members.

■ Nor does the record disclose an abuse of discretion by the bankruptcy court in denying appellants' effort seeking certification pursuant to Rule 23(b)(3). Recognizing the wide discretion delegated to trial courts generally in controversies of class certification, this court adopts the conclusion enunciated by both the Second and Eighth Circuits wherein those circuits have declared that when class certification would be appropriate under either §§ 23(b)(1) or (b)(3) of Fed.R.Civ.P. 23, the former section should control. *See Reynolds v. National Football League,* 584 F.2d 280, 284 (8th Cir.1978) wherein it is stated:

This class action would appear to qualify for certification under Fed.R.Civ.P. 23(b)(3) also, as common questions of law and fact predominate and a class action is superior to other methods for adjudication of the controversy. Nevertheless, when the choice exists between (b)(1) and (b)(3) certification, generally it is proper to proceed under (b)(1) exclusively in order to avoid inconsistent adjudication or a compromise of class interests.

*See also Robertson v. National Basketball Association,* 556 F.2d 682, 685 (2d Cir.1977) (When a class action may be certified under either (b)(1) or (b)(3), the former should be chosen when to do so will avoid the inconsistent adjudication or compromise of class interests that might otherwise occur.). *See*

*generally* 7A C. Wright, A. Miller, and M. Kane *Federal Practice and Procedure,* § 1772 (1986). In *Guy v. Abdulla,* 57 F.R. D. 14 (N.D. Ohio 1972) the court stated:

Upon consideration of these provisions, it appears that a class action is maintainable under either sub-part of Rule 23(b)(1). While it is highly probable that the same standards would be applied throughout the course of separate proceedings, the risk remains that inconsistent adjudication of the common issues could result. Thus, differing interpretations of the law could guarantee recovery by the trustee in some cases, while denying it against other defendants who are similarly situated. A clear purpose of rule 23 is to avoid such anomalous results.

Even if a class action is not employed, a judge in a later case may feel constrained by *stare decisis* to apply previously adopted rules to different defendants. While this would eliminate the possibility of inconsistent adjudications, it becomes clear that the first suit was dispositive of the class interests as a practical matter. Fed.R.Civ.P. 23(b)(1)(B); *Berman v. Narragansett Racing Ass'n,* [48 F.R.D. 333 (D.R.I. 1969)]. Thus, the requirements of Rule 23 should be utilized to assure that the rights of absent parties are adequately protected.

57 F.R.D. at 17–18; *see also In re Broadhollow Funding Corp.,* 66 B.R. 1005, 1007 (Bankr.E.D.N.Y.1986) ("[T]he cost of [multiple] litigation would deplete the assets of the bankruptcy estate, thereby rendering reorganization doubtful if not impossible.").

This court having considered appellants' remaining assignments of error concludes that they are without substance. Accordingly, the judgment of the district court as herein modified is AFFIRMED.

MERRITT, Circuit Judge, dissenting.

Because I believe that the majority has decided disputed issues of fact in its review of the grant of summary judgment in favor of the trustee, I dissent from the majority's conclusion that the payments at issue are "avoidable preferences" under 11 U.S.C. § 547(a). Summary judgment is appropriate only when there is no genuine issue of material fact and a party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Especially where making a determination of whether transfers were made in the ordinary course of business,

this [C]ourt must engage in a "peculiarly factual" analysis. The focus of this [C]ourt's inquiry must be directed to an analysis of the business practices which were unique to the particular parties under consideration and not to the practices which generally prevailed in the industry of the parties. Even if the debtor's business transactions were irregular, they may be considered "ordinary" for purposes of § 547(c)(2) if those transactions were consistent with the course of dealings between the particular parties.

*In re Fulghum Construction Corp.,* 872 F.2d 739, 743 (6th Cir.1989) (challenged payment not preference because made in the ordinary course of business) (citations omitted). In this case, however, the facts relevant to whether the transfers were made in the ordinary course of business are disputed. These disputed issues of fact preclude summary judgment and mandate trial.

The subject payments, certainly those to the taxing authorities, appear to have been made in the ordinary course of business by a mortgage servicing company. The trustee contends that the payments were made in a way designed to favor and protect the interest of certain large mortgage investors over other smaller investors. The trustee, however, has presented only bold allegations and has failed to substantiate his claims. The payees, as appellants, vigorously dispute the contention that this alleged favoritism occurred. Indeed, the facts on favoritism are unclear and are disputed. In affirming the grant of summary judgment, the Court resolves these disputed propositions of fact in the following conclusory way without any explication of the facts on which it relies:

This court cannot seriously consider appellants' assertions ... characterizing the transfers here in issue as transfers

made in the ordinary course of business ... given the totally unorthodox and illegal manner in which debtors conducted their collective business operations.... Majority Opinion at 918. Resolution of this factual dispute should be left for trial and is not the appropriate role of summary judgment.

In addition, the majority mischaracterizes *Drabkin v. District of Columbia*, 824 F.2d 1102 (D.C.Cir.1987), as holding that in all cases where the funds cannot be traced a tax payment can be an avoidable preference. *See* Majority Opinion at 916. *Drabkin*, in fact, held that, where a tax payment is made by a debtor within the period within which such tax is last payable without penalty, it may not be recovered as a preference, regardless of its traceability. *Id.* at 1115. Only where the tax payment is past due, *Drabkin* continued, is tracing necessary to avoid recovery of the payment as a preference. This distinction raises yet another issue of fact inappropriate for resolution on summary judgment—whether the payments made to the taxing authorities were for current or past due taxes. It should be noted that neither party has submitted evidence on this issue.

For the foregoing reasons, I would reverse the summary judgment and remand for trial.