In re MARK BENSKIN & CO., INC., Debtor.

George W. EMERSON, Trustee, Plaintiff,

v.

James O. MARTY, Defendant/Cross–Defendant,

and

The Estate of Ausencio L. Campos, Steven Campos, Executor, Defendant/Intervenor/Cross–Plaintiff.

Bankruptcy No. 89–22793–B.

Adv. No. 89–0288.

United States Bankruptcy Court, W.D. Tennessee, W.D.

Dec. 23, 1991.

James O. Marty and Jill Graves Clyburn, Memphis, Tenn., for James O. Marty.

George W. Emerson, Jr., Memphis, Tenn., trustee.

Michael G. McLaren, Elizabeth T. Collins, Thomason, Hendrix, Harvey, Johnson, Mitchell, Blanchard & Adams, Memphis, Tenn., for trustee.

David M. Sullivan, Memphis, Tenn., for Campos Estate.

## MEMORANDUM OPINION AND ORDER AFTER TRIAL OF ADVERSARY PROCEEDING

WILLIAM H. BROWN, Bankruptcy Judge.

In this adversary proceeding, the Trustee sued James O. Marty ("Marty") for avoidance of two transfers as either preferences or fraudulent conveyances under 11 U.S.C. §§ 547 or 548. The Estate of Ausencio L.

Campos, through Steven Campos, Executor ("Campos"), after an order approving intervention, filed an answer and cross claim against Marty. Campos basically took the position that the funds paid to Marty could be traced to an investment made by Campos with the debtor Mark Benskin & Co., Inc., that the debtor held the Campos investment in trust, and that payment to Marty out of the Campos funds was fraudulent. Campos sought recovery of $6,300.00 from Marty.

This adversary proceeding was tried on July 29, 1991. The parties have now submitted post-trial briefs. The following contains findings of fact and conclusions of law pursuant to F.R.B.P. 7052.

## APPLICABLE LAW

This proceeding was originally brought by the Trustee under 11 U.S.C. § 547 and § 548. Section 547(b) provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Section 548(a) was pled by the Trustee but was not relied upon in this trial.

Mr. Marty relied upon a defense that the subject transfers to him were withdrawals of his own property and were not property of the debtor's estate. No § 547(c) defenses were alleged nor proven. The Campos cross-plaintiff relied upon tracing concepts which will be more fully discussed. However, the Court will first address whether the transfers to Marty are avoidable by the Trustee.

## FINDINGS OF FACT

1. The Trustee called Mark Benskin ("Benskin"), the principal of the debtor Mark Benskin & Co., Inc., and himself an involuntary debtor in this Court in case number 89–23263–B. In fact, Benskin operated this debtor as a sole proprietorship rather than as a corporation. Mr. Benskin has previously entered guilty pleas in a fifty count indictment in the United States District Court in this District, Criminal Number 89–20166–G (Ex. 16), and he is presently serving a sentence in a federal institution at Millington, Tennessee.

2. In 1989, Benskin was acting as an unlicensed investment adviser. Investors, such as Marty and Ausencio Campos, would open investment accounts with Benskin and/or his company. Checks were normally payable to Mark Benskin & Co., Inc. and were deposited and commingled in a client escrow fund account. From that account, Benskin withdrew or transferred funds for all operating expenses and for Benskin's personal expenses. The debtor did not maintain separate depository accounts for each of its clients; although, it maintained separate files for each client.

3. Mr. Marty was a client of the debtor and beginning in 1988 the debtor accepted certain funds from Marty. There were no specific instructions or restrictions as to the investments to be made, and Marty's money went into the general escrow account.

4. The debtor issued to its clients, including Marty and Campos, statements confirming the client deposit. (Ex. 12) However, no separate account actually was created and the confirmation statements were fictitious.

5. On July 21, 1988, Marty transferred by check payable to Mark Benskin & Company, Inc., $5,000.00, with the notation on the check "Escrow." (Ex. 3) This check was deposited into this debtor's commingled escrow account.

6. On November 4, 1988, Marty transferred by check payable to Mark Benskin, $6,000.00, with the notation on the check "Investment." (Ex. 5) This check was deposited into this debtor's commingled escrow account.

7. No security was given nor intended in exchange for the Marty "investments."

8. When Marty paid his money, he and Benskin talked generally about investments, and Marty did not authorize Benskin to utilize Marty's investment funds for operating or personal expenses. Mr. Marty was given and signed a four page "Customer Agreement," which agreement was routinely signed by most of the debtor's clients. (Ex. 4) Mr. Benskin did not sign the Marty "Customer Agreement." Mr. Benskin testified that at the time Marty made his investments, he (Benskin) intended to place Marty's money in escrow and invest it.

9. On July 22, 1988, the debtor deposited $20,784.06 into its commingled escrow account at National Bank of Commerce ("NBC"), which deposit consisted of seven items including the Marty $5,000.00 check. (Ex. 6) This deposit was representative of the manner in which the debtor commingled deposited funds.

10. Each month the debtor issued a statement to clients such as Marty and Campos. (Exs. 2, 13) However, these statements were often fictitious and did not accurately reflect the condition of the client's "investment."

11. In February, 1989, Marty made demand for a withdrawal of $6,300.00 and a check was written to Marty, drawn on the debtor's NBC escrow account on February 10, 1989, in that amount. (Ex. 1) At that point, Marty had deposited $11,000.00 but his money was probably not invested, according to Benskin's testimony. Clearly, it was not invested distinctly for Marty. Marty's statement dated February 10, 1989, reflected a fictitious balance of $13,091.26 from which the $6,300.00 was paid. (Ex. 2) In February, 1989, there was a general run being made on the debtor by clients and the debtor was using commingled clients' funds to pay those other clients who made demand.

12. The debtor was operating a Ponzi scheme under which he took clients' funds and used them to pay other clients. Payments to some clients exceeded the "investments" made by those clients.

13. Mr. Benskin could not testify exactly what happened to Marty's money since he did not maintain separate accounts for each client and since the common escrow account was used for business and personal purposes.

14. Some investors placed notations on their investment checks, such as "CM Account" or "For Dep. in Am Capital" or "Stock Investments." (Ex. 7) Nevertheless, their checks were commingled in one escrow account. (Ex. 7) Mr. Benskin testified that the memo line on a client's check was irrelevant to what he did with the check. The debtor did in fact invest some of the client's funds, for example in American Capital Trust Co. ("American Capital"). (See Ex. 8) The debtor was not an authorized agent for American Capital; although, the debtor did receive funds and sales material from American Capital.

15. The debtor on February 29, 1988, acknowledged receipt of a deposit from Ausencio L. Campos in the amount of $88,000.00, which letter and attached documents referred to an investment in American Capital government securities. (Ex. 9) The debtor in fact did not invest the $88,000.00 in American Capital and those funds were not restricted.

16. The debtor, in January, 1989, obtained an additional $50,000.00 from Campos under false representations that those funds would be delivered to American Capital. (Ex. 11) Mr. Campos expressed a desire for a conservative investment approach; however, the $50,000.00 were neither specifically restricted nor invested.

17. As to Campos, fictitious account statements were generated. (Exs. 12 & 13)

18. The debtor did not have Campos' permission to use Campos' funds for operating expenses or for any purpose other than investment.

19. The Campos $50,000.00 funds were deposited in the NBC escrow account on January 25, 1989. (Exs. 11 & 14) The Campos funds were used like all other commingled funds.

20. The checks posted by NBC to the escrow account between January 25 and February 13, 1989 were introduced as Exhibit 15.

21. The debtor made no distinction between new and old client funds, which all were deposited in the same escrow account.

22. The Court conducted a bifurcated insolvency trial, as to the pending non-jury adversary proceedings, on January 7, 1991, after notice to all necessary parties, at which time the uncontroverted proof offered by the Trustee established that both debtors were insolvent for the entire one year preceding the bankruptcy filing.

23. By the time of Benskin's arrest in April, 1989, all of the Marty and Campos funds had been depleted. In fact, only a nominal amount remained in the debtor's escrow account.

24. Mr. Marty testified that he intended his two checks to be used for investment only, and he understood that he could obtain a return of his "investment" upon demand.

25. James L. Lindsey, Vice President and Manager of NBC's auditing department, testified that Exhibit 14 represented the posting by the bank to the debtor's escrow account, for January and February, 1989, of both deposits and checks. Between January and March, 1989, (the time relevant here), the bank's policy was to post the smallest debit (checks, withdrawal, or charge) first. After that time the bank changed its policy and began posting the largest debit first. The date a check was posted was the date the check was presented to the bank. NBC followed the "first in—first out" rule; that is, the first money credited as a deposit was the first money paid out when checks were presented.

26. Mr. Lindsey testified that the debtor's escrow account was *not* monitored by the bank to maintain a watch on what occurred.

27. Jerry Whitehorn, a certified public accountant, testified as an expert witness on NBC's posting practices and on tracing of funds through the account. Mr. Whitehorn had examined Exhibits 14 (account statements for January and February, 1989) and 15 (checks posted to the escrow account on January 25, 1989), and he testified that Exhibit 18 accurately reflected by charts, analysis and graphs the information contained in Exhibits 14 and 15.

28. As an auditor, Mr. Whitehorn would use the "first in—first out" method for tracing funds. He testified that this was the only logical method to use. Page one of Exhibit 18 traced the $50,000.00 Campos check from its deposit on January 25, 1989, at which time there was a pre-existing $143,391.81 credit which would be paid out first. Under the "first in—first out" method, money is traced in progression as credits and debits are made. Under the "first in—first out" tracing method, the $6,300.00 check payable to James O. Marty would have been paid out of the Campos $50,-000.00 deposit. (See Ex. 18) Mr. Whitehorn rejected the "last in—first out" method as illogical in banking, and he was unfamiliar with the "lowest intermediate balance" test.

29. Mr. Whitehorn conceded that tracing is a methodology and that funds in a bank account lose their separate identity upon commingling.

30. Mr. Whitehorn was not concerned, as an accountant, with whether the "first in—first out" method would result in equality for creditors in a bankruptcy scenario.

31. Mr. Whitehorn confirmed that on the dates at issue, NBC's over-draft policy was that on a given day the smallest checks would clear first.

32. Mr. Steve Campos, Executor of his deceased father's estate, testified that he and his father met with Benskin and dis-

cussed his father's conservative investment goals. He acknowledged that no restrictive notation appeared on his father's $50,000.00 cashier's check. (Ex. 11) Mr. Campos thought, based upon the false information received from the debtor, that the funds had been invested in American Capital.

33. Mr. Benskin was re-called by the Trustee to testify that his company did on occasion purchase American Capital investments but in the name of the debtor and that by the time of his arrest, all American Capital investments had been sold. Specifically, the Campos $50,000.00 was not used to purchase American Capital.

## CONCLUSIONS OF LAW

The Trustee's complaint is a core proceeding. 28 U.S.C. § 157(b)(2)(F) and (H).

As the Court's findings indicate, it is clear that the debtor was operating a Ponzi scheme, through which the debtor obtained funds from clients under the false pretense of making investments for them. Illusory profits were often paid to some clients out of the funds paid in by new clients, and that is frequently the case in such schemes. *See, e.g., Rosenberg v. Collins*, 624 F.2d 659, 663–664 (5th Cir.1980). Tragically, some "investors," such as Marty and Campos, were deceived by Mr. Benskin, while other "investors" were paid profits from their illusory investments. *See, U.S. v. Benskin*, 926 F.2d 562 (6th Cir.1991). There is no dispute that the debtor deposited and commingled all client funds into one "escrow" account at NBC. At least as to Marty and Campos, no investments were ever made in their names, and the debtor failed to maintain separate accounts for any of its clients. Fictitious statements were issued to the clients showing false balances. The debtor utilized the commingled escrow account for all business and some personal expenses.

## PREFERENTIAL TRANSFER
## TO MARTY

■ First, the Court finds that the Trustee has not proven all elements of § 547(b)[1] so as to establish that the transfer on February 10, 1989, by the debtor's check to James O. Marty of $6,300.00 was a preferential transfer (Ex. 1), and the Court concludes that this transfer may not be avoided by the Trustee under § 547(b) and that it may not be recovered from Marty, who was the initial transferee, under § 550(a)(1). There is no factual dispute that the transfer was from the debtor's account to Marty, who was a creditor, or one who had a pre-bankruptcy claim against the debtor. 11 U.S.C. § 101(10). Mr. Marty had previously deposited with the debtor a total of $11,000.00 and Marty acknowledged that this constituted an antecedent debt since Marty felt that he could demand its return at any time. In addition to the statutory presumption of insolvency under 11 U.S.C. § 547(f), this Court has found, after a separate insolvency trial, that both related debtors were insolvent for the entire year preceding the bankruptcy filing on April 14, 1989. The $6,300.00 transfer was by check dated February 10, 1989, clearly within the ninety day reachback period of § 547(b)(4)(A).

However, there was no proof concerning § 547(b)(5)'s requirement that Marty received more than he would have received in a Chapter 7 hypothetical liquidation. *See, e.g., Braniff Airways, Inc. v. Exxon Co.*, 814 F.2d 1030, 1034 (5th Cir.1987) ("To compare what the creditor would have received in a Chapter 7 liquidation with what it received pre-petition, it is necessary to consider how the debt would have been treated in a Chapter 7 liquidation.") The hypothetical Chapter 7 liquidation is measured from the date of the bankruptcy filing. *In re Tenna Corp.*, 801 F.2d 819, 823 (6th Cir.1986). This of course is a Chapter 7 case. At the point of the bankruptcy filing, the debtor was insolvent which obviously means that there were insufficient assets to pay all debts in full. *See* 11 U.S.C. § 101(32). However, it would appear that Marty was not paid 100% of his claim. Mr. Marty had an unsecured claim for $11,000.00 and he received $6,300.00 or approximately 60% of his total claim. Section 547(b)(5)'s test requires close analysis.

---

**1.** Section 547(g) places upon the trustee the burden of proving each element of § 547(b).

At the insolvency trial on January 7, 1991, of which Marty, like all non-jury avoidance defendants, was given notice, the Trustee's expert, Mr. Alan Axelbeard, a certified public accountant, testified that at no point during 1988 and up until the bankruptcy filing did the debtor come within $400,000.00 of being solvent. The Court notes that there was no proof at the January 7, 1991 hearing or at this trial as to the percentage which would be available to unsecured creditors such as Marty in a hypothetical Chapter 7 liquidation. However, the proof at the insolvency hearing established that the debtor was insolvent throughout the year before and until the bankruptcy filing. It is clear from the proof that Marty was a general unsecured creditor. As such, it has been said by one Circuit Court that under § 547(b)(5) Marty "must be charged with the value of what was transferred [$6,300.00] *plus* any additional amount that he would be entitled to receive from a Chapter 7 liquidation [on the balance of his $11,000.00 unsecured claim]. [The] net result is that, as long as the distribution in bankruptcy is less than one hundred percent, any payment 'on account' to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made." *In re Lewis W. Shurtleff, Inc.*, 778 F.2d 1416, 1421 (9th Cir.1985), *applying Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 56 S.Ct. 450, 80 L.Ed. 655 (1936); *see generally* 4 KING, COLLIER ON BANKRUPTCY ¶ 547.08 at 547–42 & 43 (1991); 2 NORTON BANKR. LAW & PRAC. § 32.09 (1991). There has never been any dispute concerning the unsecured creditors receiving less than one hundred percent, a fact which was established by the insolvency of the debtor as of the bankruptcy filing date.

This Court finds the expression of the § 547(b)(5) test in *Shurtleff* to be somewhat confusing. As stated by the Sixth Circuit in *Tenna* and again in *In re Royal Golf Products Corp.*, 908 F.2d 91, 95 (6th Cir.1990), the hypothetical Chapter 7 liquidation is conducted as of the bankruptcy filing date, at which point this debtor was insolvent. Section 547(b)(5) requires an assumption that the $6,300.00 transfer to Marty had not been made and that instead Marty would be treated as a general unsecured creditor as of the bankruptcy filing date. On that date, because of the debtor's insolvency, the unsecured creditors would clearly not receive full payment on their claims. In contrast, Marty received $6,300.00, which of course diminished the estate which otherwise would have been available on the bankruptcy filing date. Another Circuit Court has observed: "As long as the [preferential] transfers diminish the bankrupt's estate available for distribution, creditors who are allowed to keep transfers would be enabled to receive more than their share ... [otherwise] they will ultimately receive a larger share of their *unsecured* claims than other unsecured creditors." *Barash v. Public Finance Corp., et al.*, 658 F.2d 504, 509 (7th Cir. 1981). However, the *Barash* test appears to assume that the suspect preferential transfer would keep similar unsecured creditors from receiving the same percentage as the alleged preferred creditor received. As COLLIER expresses the test, "any payment to a general *unsecured* creditor within the ninety-day period preceding the filing of the petition would be preferential if other creditors in the same class would not receive the same payment in a chapter 7 liquidation, *i.e.*, the chapter 7 distribution *plus* the payment received." COLLIER ON BANKRUPTCY, ¶ 547.08 at 547–41 & 42. *Palmer Clay Products* requires the bankruptcy court to look at the "actual effect of the [preferential] payments *as determined when bankruptcy results.*" *In re Royal Golf Products Corp.*, 908 F.2d at 94, *quoting Palmer Clay Products*, 297 U.S. at 229, 56 S.Ct. at 450. It can *not* be determined from the proof that the actual effect of the $6,300.00 payment to Marty is that Marty received preferential treatment over similarly positioned unsecured creditors. In other words and quite simply, there was no proof offered by the Trustee as to the percentage available to unsecured creditors as of the bankruptcy filing date or as to the effect a return of this $6,300.00 would have on oth-

er unsecured creditors. In the absence of proof this Court should not assume that Marty received more than he would have received in a Chapter 7 liquidation.

There were no defenses offered under § 547(c).[2] However, because of failure of proof under § 547(b)(5), the Court concludes that the $6,300.00 transfer to Mr. Marty was not a preference which is avoidable by the Trustee.

### TRACING BY CAMPOS

■ The initial result of the Court's prior conclusion is that the $6,300.00 is not property of this bankruptcy estate and the remaining issue is whether the Campos estate may prevail over Marty. At this stage, the difficult question of the bankruptcy court's jurisdiction should be discussed. Had the Court concluded that the Trustee could avoid and recover the preference from Marty, the dispute between Campos and the Trustee would certainly be core since it would involve property of the estate. 28 U.S.C. § 157(b)(2)(A), (B) and (O). Now, the focus is different in that the dispute does not involve the Trustee nor property of the estate. This Court is cautious about construing its core jurisdiction too broadly. *See, e.g., In re G. Weeks Securities, Inc.,* 89 B.R. 697, 707 (Bankr. W.D.Tenn.1988). However, the parties treated this entire trial as a core proceeding, and the resolution of the dispute between Campos and Marty will affect claims against this estate and does affect "the adjustment of the debtor-creditor ... relationship." 28 U.S.C. § 157(b)(2)(A) and (O). Further, forcing Campos and Marty to retry their dispute in state court would be burdensome on the parties and that court. Therefore, the Court will enter a final order, which of course will not prejudice the rights of the parties to have Article III appellate review under 28 U.S.C. § 158.

■ Mr. Marty had pointed to § 541(b)(1) which excludes from property of the bankruptcy estate "any power that the debtor

may only exercise solely for the benefit of an entity other than the debtor." This exception is now moot but clearly does not apply under the facts presented to this Court. While Marty intended for his funds to be invested and while Benskin testified to a short-lived intent to invest Marty's funds, the over-whelming evidence is that Benskin was operating a Ponzi scheme, that he used Marty's funds for whatever purpose suited Benskin, and that he did not in fact invest Marty's funds for Marty. Marty argues that his funds were placed in trust and there is some irony in that this argument is identical to that of Campos. The difference is that Marty's funds were dissipated by Benskin and no identifiable Marty trust *res* existed when Marty received his $6,300.00 check. The term "escrow" on the NBC account was an obvious misnomer. Mr. Benskin was engaging in a fraudulent activity and the Court concludes that he never actually or specifically intended to invest Marty's funds. Clearly, Benskin retained sole control over the disposition of those funds, notwithstanding any fiduciary obligation Benskin owed to his clients.[3]

■ In determining whether Campos may trace its deposit to the Marty check, the first issue is whether the Marty and/or Campos funds were held by the debtor in either an express or constructive trust. State law may certainly be a factor in the analysis of whether a trust existed; although, in a bankruptcy case, state law would not necessarily determine the outcome, since bankruptcy law and policy and the supremacy clause to the United States Constitution come into play. *See, e.g., In re Winkle,* 128 B.R. 529, 534–35 (Bankr. S.D.Ohio 1991). "In short, state law must be applied in a manner consistent with federal bankruptcy law." *Id.* at 535. Bankruptcy law and policy is still relevant notwithstanding the conclusion that the Marty check is not recoverable by the Trustee, because both Marty and Campos remain

---

2. *See, e.g., In re Southern Industrial Banking Corp.,* 87 B.R. 524 (Bankr.E.D.Tenn.1988) (concluding that Ponzi schemes are not legitimate businesses and thus § 547(c)(2) is not an available defense).

3. For example, Benskin testified that the memo line of any client checks was not determinative of his disposition of those checks. *See,* Finding of Fact, No. 14.

creditors of this bankruptcy estate, and the "adjustment of the debtor-creditor ... relationship" is a continuing issue. 28 U.S.C. § 157(b)(2)(O). However, bankruptcy law and policy will be more significant in those proceedings where the Trustee does establish the elements of § 547 or § 548.

■ Campos' counsel argues that Benskin did not have Campos' permission to use the Campos check for noninvestment purposes. The same is true for Marty and presumably for all Benskin clients. It is extremely doubtful that any client "investing" funds with Benskin would consent to noninvestment uses. There is no question that Benskin obtained the Campos funds with fraudulent intent and that the Campos $50,000.00 check was not invested, notwithstanding the fictitious statement sent to Campos indicating that investments had been made.

Campos of course argues that use of the "first in-first out" tracing method logically demonstrates that the $6,300.00 check to Marty was paid out of the $50,000.00 Campos deposit. (*See* Ex. 18) Further, Campos argues that the fact that Campos desired to have a conservative investment in American Capital, that Benskin falsely represented that such an investment would be made, and that Benskin did in fact invest another client's funds in American Capital (Exs. 7 & 8), all point to a conclusion that Benskin misappropriated Campos' $50,000.00 and that Benskin held the Campos funds in actual or constructive trust.

Campos' counsel and witnesses have done an excellent job of graphically depicting their tracing concept, and there is no factual dispute that under the "first in-first out" method the Marty check was paid out of the Campos $50,000.00 deposit. This tracing method appears to be accepted in Tennessee, at least outside of a bankruptcy context. *See, e.g., State ex rel. Robertson v. Bank of Bristol,* 165 Tenn. 461, 55 S.W.2d 771 (1933); *State ex rel. Robertson v. Thomas W. Wrenne & Co.,* 170 Tenn. 131, 92 S.W.2d 416 (1936). However, the threshold issue is whether the Campos $50,000.00 was received and held in trust by Benskin or his company.

An analysis of the Campos arguments involves many factors. For example, Marty also argues, as would all of Benskin's clients, that their "investments" were paid in a trust relationship to Benskin. Of course, the Marty "investment" had been consumed by the time Marty received his $6,300.00 check. It may nevertheless be argued that the equities do not on their face favor Campos any more than any other "investor" who lost money in this Ponzi scheme. The Court, however, concludes in this particular proceeding that the equities favor Campos over Marty.

Further, while Mr. Campos expressed a desire for a conservative investment, the $50,000.00 check was not specifically restricted nor was it placed into a separate or true escrow account. Rather, it was commingled into a common fund. Mr. Campos of course did not know how Benskin would deposit the money. It is true that Campos could easily have established a written trust, could have restricted the use of the funds in writing, or could otherwise have expressed a written intent to impose a trust obligation on Benskin. The fact is that there was no written trust agreement.

The establishment of an oral trust in Tennessee requires proof "greater than a preponderance of the evidence." *Kopsombut–Myint Buddhist Center v. State Board of Equalization,* 728 S.W.2d 327, 333 (Tenn.App.1986). "The existence of a trust requires proof of three elements: (1) a trustee who holds property and who is subject to the equitable duties to deal with it for the benefit of another, (2) a beneficiary to whom the trustee owes the equitable duties to deal with the trust property for his benefit, and (3) identifiable trust property." *Id.*

Mr. Campos made two investments with Benskin, neither of which was specifically restricted in writing. Steve Campos testified that he and his father met with Benskin and that this father wanted to invest conservatively in government backed treasury bills. They assumed that the money had been so invested because of fictitious statements issued by the debtor.

Former Bankruptcy Judge Clive Bare observed: "Subject to general rules as to the essentials of an express trust [citing Bo-

gert, *Law of Trusts* ], where a person has or accepts possession of personal property with the express or implied understanding that he is not to hold it as his own absolute property, but is to hold and apply it for certain specific purposes or for the benefit of certain specified persons, a valid and enforceable express trust exists." *In re Elrod,* 42 B.R. 468, 473 (Bankr.E.D.Tenn. 1984). However, Judge Bare has also noted that it is dependent "upon the manifested intention of the parties whether a trust or a debt is created. If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor or a third person, a trust is created. If the intention is that the person receiving the money shall have the unrestricted use thereof, being liable to pay a similar amount whether with or without interest to the payor or to a third person, a debt is created." *In re Property Leasing & Management, Inc.,* 50 B.R. 804, 807–808 (Bankr.E.D.Tenn.1985), *citing,* Restatement (Second) of Trusts, § 12 comment g (1959).

The proof in the present case is that Mr. Campos desired to have his money invested in treasury bills or American Capital and he discussed that with Benskin. Mr. Benskin did hold himself out to represent American Capital. It is true that Campos failed to express that his "investments" should be kept in a separate fund, but Campos intended for a distinct investment to be made on his behalf. The intention of Benskin is clear—he intended to defraud Mr. Campos. Nevertheless, Benskin through his fraudulent intent can not escape his fiduciary obligation to Campos. Benskin represented to Campos through words and actions that he was a legitimate investment adviser, and Benskin accepted Campos' $50,-000.00 with an equitable duty to deal with the $50,000.00 for Campos' benefit. The fact that Benskin failed to do that does not destroy the trust relationship. Campos has traced the $6,300.00 check to Marty from an identifiable $50,000.00 deposit of Campos' check. Therefore, from the facts presented here, the Court concludes that the $50,000.00 was paid in trust to Benskin and that to the extent it is identifiable, the trust property still existed.

From an equitable view, Marty's money had already been dissipated when Marty received his $6,300.00 check, and it is not fair for Marty to receive a return of his nonexistent funds from Campos' deposit.

The Court feels compelled to observe that this result may be unique to this proceeding. Had the Trustee carried the burden of proving all elements of § 547(b), the Marty transfer would have been an avoidable preference and, as such, it would have been property of the estate. Then, a different tracing methodology *may* have been employed. *See, e.g., First Federal of Michigan v. Barrow,* 878 F.2d 912, 916 (6th Cir.1989). Further, Mr. Campos would have been competing as an unsecured creditor for his pro-rata share of the bankruptcy estate. Therefore, this opinion should not be read as a *per se* ruling that all intervenors necessarily would prevail against the bankruptcy Trustee.

But, under the unique facts of this proceeding, the Campos estate must prevail over Mr. Marty.

IT IS THEREFORE ORDERED:

1. The Trustee failed to prove the necessary element of § 547(b)(5), and the $6,300.00 check to Mr. Marty is *not* an avoidable preferential transfer;

2. Applying Tennessee trust law, the Court concludes that the Campos $50,-000.00 was trust property which was identifiable and to which the $6,300.00 Marty check was traceable;

3. The Marty funds had been dissipated and the $6,300.00 check to Marty was paid by the bank from the Campos $50,000.00 deposit; and

4. Judgment is rendered in favor of the Campos estate against James O. Marty for $6,300.00 plus post-judgment interest, at the Tennessee statutory rate, until paid.

SO ORDERED.