**In re NATIONAL CENTURY FINANCIAL ENTERPRISES, INC., an Ohio corporation, et al., Debtors.**

**Amedisys, Inc., et al., Plaintiffs,**

**v.**

**JP Morgan Chase Manhattan Bank, as Trustees, et al.**

**Bankruptcy No. 02–65235.**
**Adversary No. 02–2576.**

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

May 27, 2004.

Julie E. Brigner, Hahn Loeser & Parks LLP, Stephen E. Chappelear, Marc J. Kessler, Columbus, OH, Kaye M. Caballero, Joseph E. Friend, Scott N. Hensgens, Peter A. Kopfinger, Claude F. Reynaud, Jr., Baton Rouge, LA, for Plaintiffs.

Lisa M. Diem, c/o Kegler Brown Hill & Ritter, Matthew A. Kairis, William C. Wilkinson, Columbus, OH, for Defendant.

John F. Stock, Jennifer Turk, Columbus, OH, for Creditors.

Michael Graney, Michael R. Szolosi, Columbus, OH, for Interested Parties.

### ORDER AND DECISION ON MOTIONS OF DEBTORS AND DEBTORS–IN–POSSESSION AND JP MORGAN CHASE BANK FOR SUMMARY JUDGMENT AGAINST AMEDISYS, INC. AND CERTAIN OF ITS AFFILIATES

DONALD E. CALHOUN, JR., Bankruptcy Judge.

The matters before the Court are: (1) JP Morgan Chase Bank's Motion for Summary Judgment, (2) Amended Motion of Defendant National Century Financial Enterprises, Inc., et al. for Summary Judgment, (3) Opposition of Amedisys and Related Entities to the Motions for Summary Judgment of Defendants National Century Financial Enterprises, Inc. et al. and JP Morgan Chase Manhattan Bank, (4) JP Morgan Chase Bank's Reply to Amedisys, Inc. et al.'s Memorandum in Opposition to JP Morgan Chase Bank's Motion for Summary Judgment, and (5) Reply Memorandum of Defendant National Century Financial Enterprises, Inc., et al. in support of Motion for Summary Judgment.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Before getting to the legal analysis, a brief factual and procedural history is in order.

### I. PROCEDURAL HISTORY

On November 8, 2002, the Amedisys Entities commenced an action in the United States District Court, Southern District of Ohio, Eastern Division (Civ. No. C2–02–1105) against JP Morgan Chase Manhattan Bank ("Trustee"), NPF VI, NPFS, NCFE and Lance Poulsen.[1] Within the complaint, the Amedisys Entities demanded, *inter alia*, the turnover of some $7.3 million which purportedly represented the proceeds of "non-purchased accounts receivable." On November 18, 2002 (the "Petition Date"), all of the Debtors[2], including National Century Financial Enterprises ("NCFE"), National Premier Financial Services, Inc. ("NPFS"), NPF VI, Inc. ("NPF VI"), other than Allied Medical, Inc., commenced their respective reorganization cases by filing voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On February 14, 2003, Allied commenced its Chapter 11 case. The Debtors' Chapter 11 cases have been con-

---

**1.** The Amedisys Entities are Amedisys, Inc.; Amedisys Home Health, Inc. of Alabama; Clinical Arts Home Care Services, Inc.; Central Home Health Care; Tugaloo Home Health Agency; North Georgia Home Health Agency; Coosa Valley Home Health; Amedisys Home Health Inc. of Louisiana; Amedisys Home Health, Inc. of North Carolina; Amedisys Home Health Inc. of Oklahoma; Amedisys Home Health Inc. of Tennessee; Amedisys Home Health Inc. of Virginia; Superior Home Health Care; Amedisys Northwest Home Health, Inc.; Northwest Home Health, Inc.; Amedisys Specialized Services, Inc.; Precision/Amedisys Specialized Medical Ser-

vices; Amedisys Alternate–Site Infusion Therapy Services, Inc.; Home Health of Alexandria, Inc.; Cornerstone Home Health Quality Home, Inc.; PRN, Inc. d/b/a Amedisys Alternate–Site Infusion Therapy Services; Infusioncare Solutions, Inc. d/b/a Precision Health Systems; and Amedisys Surgery Centers, L.C.

**2.** Generally, when the Court refers to the "Debtors" in this Decision, it will only mean National Century Financial Enterprise, National Premier Financial Services, and NPF VI.

solidated for procedural purposes only and are being administered jointly. The Debtors are continuing in possession of their respective properties and are operating and managing their businesses, as debtors in possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code.[3]

On December 5, 2002, the United States Trustee (the "U.S. Trustee") appointed a statutory committee of unsecured creditors in these Chapter 11 cases pursuant to Section 1102 of the Bankruptcy Code. On January 9, 2003, the U.S. Trustee appointed two official subcommittees. Those subcommittees are the Official Subcommittee of NPF VI Unsecured Creditors and the Official Subcommittee of NPF XII Unsecured Creditors.

On or about December 19, 2002, the United States District Court for the Southern District of Ohio, Eastern Division, transferred the Ohio Action to this Court. That transferred case, which is the present case, was assigned Adversary Proceeding No. 02–2576. On February 19, 2003, this Court held a status conference regarding the transferred case. On February 21, 2003, the Amedisys Entities filed their First Amended Complaint. The Defendants named in the First Amended Complaint were JP Morgan Chase Manhattan Bank, as Trustee, NPF VI, NCFE, and NPFS. The First Amended Complaint removed JP Morgan as a defendant to certain causes of action. A Second Amended and Restated Complaint ("Second Complaint") was filed by Amedisys on January 16, 2004.[4] The parties in the Second Com-

plaint are the same as in the First Amended complaint.

## II. FACTUAL HISTORY AND FINDINGS

Debtor, National Century Financial Enterprises, Inc., is an Ohio corporation. According to the schedules filed, NCFE is the direct or indirect parent of each of the other Debtors. It has been represented to the Court that prior to the Petition Date, the Debtors were one of the country's largest providers of healthcare accounts receivable financing. The Debtors financed and serviced more than $15 billion in healthcare accounts receivable. The Debtors also provided other financing and leasing services to healthcare companies.

The Debtors historically financed the purchase of eligible receivables primarily through private placement sales of bonds to institutional investors. The Debtors offered financing to healthcare providers by buying from them certain of their receivables-monies due to the providers from insurance companies and insurance-like programs for services performed by the providers. All of the Debtors' outstanding bonds as of the NCFE Petition Date were issued by Debtors NPF VI and NPF XII, Inc. ("NPF XII").

NPF VI and NPF XII are special purpose entities that obtained money from investors in exchange for promissory notes. As of the Debtors' Petition Date, it is reported that the aggregate outstanding principal amount of the bonds issued by NPF VI was $924,995,000.00, and the aggregate outstanding principal amount of

---

3. As of the date of this decision, a Fourth Amended Liquidating Plan was filed by the Debtors and confirmed by the Court.

4. The Second Amended Complaint was filed after JP Morgan and the Debtors filed their summary judgment motions. In a telephonic conference held with all interested parties,

the parties indicated to the Court that the summary judgment motions of JP Morgan and the Debtors should be tested against the Amedisys Second Amended Complaint even though the Second Amended Complaint added new counts and theories.

the bonds issued by NPF XII was $2,047,500,000.00. The notes issued by NPF VI were pursuant to an indenture agreement titled "NPF VI, Inc. Health Care Receivables Securitization Program Notes Master Indenture" ("Indenture Agreement"). Chase Manhattan Bank, now known as JP Morgan Chase, was appointed the indenture trustee pursuant to this agreement. Pursuant to the Indenture Agreement between NPF VI and JP Morgan, accounts were established at JP Morgan to handle the collection and distribution of funds in connection with the amounts received from all Seller participants in NPF VI as proceeds from the purchased receivables.

Amedisys is a leading multi-regional provider of home health care nursing services in the Southern and Southeastern United States. Amedisys and the Debtors entered into a contractual relationship on December 10, 1998.[5] Pursuant to the Sale and Subservicing Agreements ("Sale Agreement") between the NPF VI, NPFS, NCFE and Amedisys, NPF VI agreed to "purchase" accounts receivable generated by Amedisys on an ongoing and regular basis. The Sale Agreement created a complicated relationship between the Debtors, JP Morgan and Amedisys.

### A. The Sale Agreement

The Sale Agreement is the ruling document that governed the relationship between the parties. A brief description and delineations of relevant portions of the document are necessary.

#### Definitions

"Lockbox Account" has the meaning specified in Section 2.3(a).

"Determination Date" means the Business Day preceding the Purchase Date of each week.

"Eligible Receivable" means, at any time, a Receivable as to which the representations and warranties of Section 4.2 are true and correct in all respects at the time of Purchase.

"Purchase" means a purchase by the Purchaser of Eligible Receivables from the Seller pursuant to Section 2.2.

"Purchaser" means NPF VI, Inc., an Ohio Corporation, together with its successors and assigns.

"Seller" means Amedisys Home Health, Inc. [and its numerous affiliates].

"Trustee" means The Chase Manhattan Bank, a national banking association, or any successor Trustee appointed by the Purchaser.

Section 2.2 Conveyance of Receivables.

(a) . . . Upon receipt of a Purchase Notice, the Servicer [NPFS], in its sole discretion, as agent for the Purchaser, shall determine which, if any, of the Eligible Receivables specified therein the Purchaser shall purchase. . .

(c) Following payment of the Purchase Price on any Purchase Date, ownership of each Purchased Receivable will be vested in the Purchaser. The Seller shall not take any action inconsistent with such ownership and shall not claim any ownership interest in any Purchased Receivable. . . .

Section 2.3 Establishment of Accounts; Conveyance of Interest Therein; Investment.

(a) *Lockbox Account.* Prior to the execution and delivery of this Agreement, the Seller shall (i) establish and maintain at the Seller's expense (A) . . . (the

---

**5.** Each of the Amedisys entities entered into separate agreements with the Debtors. The Court will treat the separate agreements as one because there is no indication that there is a substantial or substantive variation between the separate agreements.

"Medicare Lockbox Account") and (B) an account in the name of the Servicer into which all Collections from Eligible Payors in respect of other Receivables shall be deposited (the "Commercial Lockbox Account"); provided that neither the Seller nor the Servicer shall be permitted to withdraw any amounts from the Commercial Lockbox Account or change the procedures under the Lockbox Account Agreement except in the case of an assignment by the Purchaser . . .

(d) The Seller does hereby sell, transfer, assign, set over and convey to the Purchaser all right, title and interest of the Seller in and to (i) all amounts deposited, from time to time, in the Seller Credit Reserve Account and the Offset Reserve Account and (ii) subject to the provisions of Article VI hereunder, all amounts deposited, from time to time, in the Lockbox Account and the Collection Account. . . .

Section 2.4 Grant of Security Interest.

It is the intention of the parties hereto that each payment by the Purchaser to the Seller with respect to the Purchased Receivables to be made hereunder shall constitute part of the purchase and sale of such Purchased Receivables and not a loan. In the event, however, that a court of competent jurisdiction were to hold that the transaction evidenced hereby constitutes a loan and not a purchase and sale, it is the intention of the parties hereto that this Agreement shall constitute a security agreement under the UCC and any other applicable law, and the Seller shall be deemed to have granted to the Purchaser a first priority perfected security interest in all of the Seller's right, title and interest in, to and under the Purchased Receivables . . .

Section 6.1 Collection Account.

The Purchaser and the Servicer acknowledge that certain amounts deposited in the Collection Account may relate to Receivables other than Purchased Receivables and that such amounts continue to be owned by the Seller. All such amounts shall be returned to the Seller in accordance with Section 6.3.

Section 10.6 Amendments; Waivers; Consents.

No modification, amendment or waiver of, or with respect to, any provision of this Agreement, and all other agreements, instruments and documents delivered pursuant hereto or thereto, nor consent to any departure by the Seller or the Subservicer from any of the terms or conditions thereof, shall be effective unless it shall be in writing and signed by each of the parties hereto. Any waiver or consent shall be effective only in the specific instance and for the purpose for which given. . . .

Section 10.7 GOVERNING LAW; CONSENT TO JURISDICTION; WAIVER OF JURY TRIAL.

(a) THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS (AS OPPOSED TO CONFLICT OF LAWS PROVISIONS) OF THE STATE OF OHIO . . .

Pursuant to the Sale Agreement, NCFE bought Amedisys' accounts receivable on a weekly basis. The Sale Agreement contractually obligated Amedisys to convey to NPFS on a weekly basis a Purchase Notice that identified all eligible receivables owned by the Amedisys. After the Purchase Notice was submitted, NPFS would make a determination of which submitted receivables were eligible for purchase and calculated the funds Amedisys was entitled to receive after deduction of program costs and other reserve accounts fees. Amedisys received funding from the receivables

in the week after the Purchase Notice was given.

The methodology for the collection of the NCFE purchased receivables was also governed by the Sale Agreement. However, the Indenture Agreement also dictated the general operating procedures of NCFE Defendants, JP Morgan, Amedisys and had implications on the relationship between Amedisys and the various Debtors. Amedisys had set up pursuant to the Sale Agreement, which also incorporated a Lockbox Agreement, a Lockbox Account at Huntington Bank. All of the payors of the accounts receivable that Amedisys sold to NPF VI were instructed to send their payments to the Lockbox Account at Huntington Bank. The Lockbox Account was swept daily and the receipts of receivables were documented. Once the receivables were documented, the receipts form the Lockbox Accounts were swept into a JP Morgan Collection Account, which daily accrued funds not only from the Amedisys Lockbox Account, but also from other healthcare providers that had similar contractual relationships with NPF VI.

The JP Morgan Collection Account was set up pursuant to the Indenture Agreement, which contemplated the creation of five accounts for the operation of NCFE business. The Collection Account was the first account. The Collection Account collected and centralized all receipts from accounts receivable from the many lockbox accounts of the various NPF VI contracted healthcare providers. The Purchase Account was the account from which NPF VI paid for the various receivables it bought from its many contracted healthcare providers. The Reserve Accounts were established as credit enhancements for the securitization of the receivables. The Offset Reserve and the Equity Account also functioned in a similar fashion.

From the documents placed into the record, including numerous pages of depositions, affidavits, and emails, it seems that the parties' relationships in the first three years prior to October, 2002 progressed in accordance with the Sale Agreement and the Indenture Agreement with minor though not unsubstantial deviations. Amedisys would sell its receivables to Debtors on a weekly basis and the Debtors would pay Amedisys in accordance with the Sale Agreement.[6]

However, in October, 2002, the relationship between the parties changed. In the first three weeks of October, 2002, Amedisys did not request any funding against the receivables it submitted to NPF VI, which amounted to some $7.3 million dollars. The CFO of Amedisys stated in his deposition,

A: "Amedisys was in the habit of doing its cash flow forecasts and sending an e-mail request to the respective person-the appropriate person at NCFE asking for funds to be wired to the Amedisys account, which generally happened-in fact, until the very end, happened on a Thursday. I believe that almost every week a request was made prior to October 2002, when, for three consecutive weeks, no request was made."

Q: So this lack of funding requests or the fact that Amedisys did not make funding requests for the three weeks in October was a deviation from the norm?

---

**6.** Evidence shows that Amedisys did from April, 2002 to October, 2002 ask for and receive sometimes more and sometimes less funding than the amount of receivables it submitted to the Debtors. Mr. Browne, the CFO of Amedisys, stated in Exhibit H, "Q:

There had been credit balances in the summer, and then there had been additional receivable financing which resulted in the net debit position held by Amedisys going into October vis-á-vis NPF VI? A: That's correct."

A: It was.

When asked for the reasons why Amedisys did not make a funding request, the CFO stated:

Q: [F]or three weeks in October, you were submitting receivables, but you were not requesting funding, correct?

A: Correct.

Q: And you were doing that, I believe you testified, because you were in anticipation of this acquisition that you were planning; is that correct?

A: I think I testified that there were two reasons why we had continued to keep the facility going; one was that we had an acquisition that we were anticipating doing later on in 2002, and, secondly, that we kept the program going because to terminate the program meant that we would have had to repay the note to NPF Capital in entirety on the same day.

Amedisys' decision not to request funding for the receivables turned out to be a financially devastating decision. On October 22, 2002, Amedisys requested $2.8 million it was entitled to under the Sale Agreement. The funding did not come in time and was paid in half installments on two different days. Then on October 29, 2002, Amedisys asked for an additional funding to which it was entitled. The funding never occurred except for some $38,000.00. NCFE was in grave financial distress by that time. The Trustee for NPF XII securitization, Bank One, had declared an event of default along with various bondholders of NPF XII. JP Morgan, the Trustee for NPF VI notes, also stopped funding pending investigation by the end of October, 2002.

According to the evidence in record, Amedisys and NCFE, and to a certain extent JP Morgan, did explore avenues to try to resolve the situation. Representatives from Amedisys and NCFE by Octo-ber 31, 2002 decided that Amedisys be allowed to perform a buyout reconciliation. Amedisys and NCFE explored various ways to offset the $7.3 million that NPF VI owed to Amedisys with a roughly $6 million that Amedisys owed to another subsidiary of NCFE, National Premier Finance Capital, Inc. ("NPF Capital"). In early-November, 2002, NCFE did make a request to JP Morgan to setoff the net balance between NPF Capital Note and funding was owed to Amedisys. The request was denied by JP Morgan.

## III. PLEADINGS

### A. Relief Sought by Amedisys–The Second Complaint

In Count 1 of the Second Amended Complaint, the Amedisys Entities seek a declaratory judgment against all the Defendants. The Amedisys Entities seek entry of a declaratory judgment declaring the parties' respective rights and obligations, including, *inter alia*, the parties' respective rights and obligations under the sale agreements, the Trust Agreement and related documents, and the parties' respective rights and obligations in connection with the funds in the possession or control of the Trustee for the NCFE entities.

In Count 2, Amedisys seeks a declaratory judgment that the Defendants owed a fiduciary duty to Amedisys as an escrow agent and that it should return the $7.3 million on deposit to Amedisys. In Count 3, Amedisys seeks a decree from the Court directing all Defendants except JP Morgan to return its money under an express trust theory. In Count 4, Amedisys seeks relief against all parties under a constructive trust theory. In Count 5 of the Second Amended Complaint, Amedisys seeks relief against all Defendants under resulting trust theories.

In Count 6 of the Second Amended Complaint, The Amedisys Entities seek a turnover and return of Amedisys' funds in the amount of at least $7,337,569.00. In Count 7 of the Second Amended Complaint, the Amedisys Entities seek a determination that the NCFE Defendants have specifically breached the sale agreements by failing, *inter alia*, to timely and properly return funds to the Amedisys Entities, failing to properly maintain the Lockbox Accounts, failing to properly maintain a detailed accounting record of all deposits and withdrawals from the reserve accounts, and improperly allocating, distributing and commingling such funds. In Count 8 of the Second Amended Complaint, the Amedisys Entities seek specific performance mandating that the NCFE entities remit not less than the $7,337,569.00 amount to the Amedisys Entities. In Count 9, the Amedisys Entities request a judgment entry determining that the NCFE Defendants have breached their fiduciary duties by failing and refusing to take actions to ensure the distribution of funds to the Amedisys Entities.

In Count 10 of the Second Amended Complaint, the Amedisys Entities seek a judgment determining that the NCFE Defendants made fraudulent and misleading representations upon which the Amedisys Entities relied. The allegations in Count 10 are against all Defendants, except the Trustee. In Count 11 of the Second Amended Complaint, the Amedisys Entities seek an order for accounting of books and records from all named Defendants. In Count 12 of the First Amended Complaint, the Amedisys Entities seek an order removing NPFS as a servicer. The allegations in Count 12 only are against Defendant NPFS.

Finally, in Count 13 of the Second Amended Complaint, the Amedisys Entities seek entry of an order determining that the diversion and pledging of certain funds resulted in an intentional conversion of funds that are property of Amedisys Entities, contrary to the sale agreements and trust agreement, for which, as a proximate and direct result, the Amedisys Entities have been irreparably harmed. The allegations in Count 13 are against all Defendants, except JP Morgan.

## B. *Arguments of the Parties*

### 1. *JP Morgan's Motion for Summary Judgment*

JP Morgan's summary judgment motion is based on the argument that the funds in question are not owned by Amedisys. JP Morgan states that Amedisys indisputably sold the receivables to NPF VI, citing to the various emails between the parties and the course of conduct leading up to October, 2002. The Trustee argues that even if the ownership issue is not resolved, Amedisys' complaint that relies on constructive trust and turnover theories fail because the funds were commingled with other funds at JP Morgan and forever lost their provider identity. Essentially, JP Morgan alleges that the funds cannot be traced. The other counts in Amedisys' complaint also fail, according to JP Morgan, because JP Morgan owed no fiduciary duty to Amedisys. The Trustee was never in contract with Amedisys.

### 2. *Debtors' Motion for Summary Judgment*

The Debtors' arguments in their motion essentially mirror JP Morgan. The First Argument the Debtors make is that Amedisys is an unsecured creditor like the rest of the healthcare providers that the Debtors financed. Stating that the $7.3 million in receivables were "sold" to the Debtors, the NCFE Defendants argue that it merely failed to pay Amedisys for the receivables it bought pursuant to the Sale

Agreement. The NCFE Defendants also argue that Amedisys cannot assert a constructive trust claim because as a matter of law the Sixth Circuit does not recognize a constructive trust claim in bankruptcy where the claim was created by non-fraudulent transfer in the ordinary course of business. NCFE also argues that the rest of Amedisys' claims also fail as a matter of law because 1) NCFE owes no fiduciary duty to Amedisys, 2) NCFE has not committed fraud or conversion, and 3) an accounting has already been provided to Amedisys.

### 3. Amedisys' Response in Opposition

Amedisys vehemently opposed the motions for summary judgment stating that there were many issues of material fact and summary judgment cannot be granted as a matter of law. Citing to Section 2.2 of the Sale Agreement, Amedisys' main contention is that NCFE never purchased the accounts receivable. Amedisys argues that title to the "non-purchased" receivables remained owned by Amedisys and the documents created a relationship of deposit, bailment or escrow between Amedisys, the Debtors and JP Morgan.

## IV. LEGAL ANALYSIS

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure, incorporated by Bankruptcy Rule 7056 provides:

> [Summary judgment] ... shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The purpose of a motion for summary judgment is to determine if genuine issues of material fact exist to be tried. *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir. 1978). The party seeking summary judgment bears the initial burden of asserting that the pleadings, depositions, answers to interrogatories, admissions and affidavits establish the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). The burden on the moving party is discharged by a "showing" that there is an absence of evidence to support a nonmoving party's case. *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548. Summary judgment will be appropriate if the nonmoving party fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof. *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548. Thus, the ultimate burden of demonstrating the existence of genuine issues of material fact lies with a nonmoving party. The evidence must, however, be viewed in the light most favorable to the nonmoving party. *Lashlee*, 570 F.2d at 110–111.

The nonmoving party must do more than rest upon the allegations found in the pleadings, and must demonstrate that a genuine issue exists for trial through his or her own affidavits, depositions, answers to interrogatories, and admissions on file. The mere existence of a scintilla of evidence in support of a proposition will be insufficient to overcome a properly plead motion for summary judgment, and no issue will remain for trial unless there is sufficient probative evidence for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### B. Court Review

Within the context of the many proceedings in this bankruptcy case, various par-

ties have represented to the Court that this bankruptcy case presents a variety of complex and complicated issues. Throughout the course of this case, those representations have been very accurate. Many of the motions and pleadings presented have revolved around very complex issues. The parties to the matters before this Court are very well aware of the complicated issues involved. The parties involved are not strangers to the myriad of issues pending before this Court. In making this decision, this Court has taken judicial notice of the various actions involving these same parties pending before it and of the actions taken in Louisiana.

### C. *Analysis of the Sale Transactions*

■ The Defendants and Amedisys seriously disagree whether accounts receivable submitted by Amedisys in October, 2002 for purchase under the Sale Agreement were "purchased accounts receivable" or "non-purchased accounts receivable" or even if the NCFE Defendants ever made purchases. Accordingly, the threshold issue to be resolved by the Court regarding Defendants' motions for summary judgment is whether those receivables were purchased by NPF VI at the time they were submitted by Amedisys.

Amedisys adamantly argues that accounts receivable were not purchased by NCFE because of Section 2.2(c) of the Sale Agreement, which provides that "[f]ollowing payment of the Purchase Price on any purchase date, ownership of each Purchased Receivables will be vested in the Purchaser." Pursuant to Section 2.2(c), Amedisys argues that the ownership of accounts receivable submitted in October were not transferred because NPFS did not honor Amedisys' funding request. The Court disagrees with Amedisys' assessment and concludes that Amedisys waived its right to receive the purchase price of

the accounts receivable submitted in October, 2002 pursuant to the Sale Agreement and thus is estopped from claiming that NPF VI did not purchase the accounts receivable. Overwhelming evidence submitted into the record shows that the parties after April, 2002 functioned in a manner where Amedisys sold the receivables to NCFE but did not request funding for the sale until the caprices of its own business cycle called for revenues.

Amedisys also argues that Amedisys and NCFE agreed in April, 2002 that Amedisys would not have to sell all of its eligible receivables. The Plaintiff states in its motion, "[i]n April 2002, [Amedisys] asked NCFE not to purchase any more receivables unless specifically requested, and NCFE agreed." However, Amedisys has not proffered any evidence to support such an assertion. Rather, all of the evidence, including direct deposition testimony from Amedisys' own CFO, shows that Amedisys did indeed sell its accounts receivable to NCFE Defendants, and they were of the "purchased accounts receivable" sort defined in the Sale Agreement.

The Defendants and Amedisys both have no dispute that in fact the sale and purchase scheme of the Sale Agreement had been functioning as intended by Amedisys and NPF VI until April, 2002. Amedisys submitted all its accounts receivable for sale and NPFS instructed JP Morgan to wire to Amedisys the proceeds of the purchased receivables. However, from April, 2002, Amedisys had started to request sometimes less than and sometimes more than the full amount of purchased receivables from NCFE. As the CFO of Amedisys stated in his deposition, "[w]e requested funding as we needed it."

Amedisys accumulated credit during the summer of 2002, but by the end of September, 2002, Amedisys was in a net debit position, owing NPF VI about $1.6 million.

Amedisys' CFO explained Amedisys' arrangement with NPF VI as follows:

Q: (By counsel for NCFE) And once that calculation is made by NPFS, why would NPF VI not then cause a transfer of the full value of the receivables tendered by Amedisys the prior Wednesday?

A: Because Amedisys did not request the full amount.

Q: So Amedisys was entitled to have the full amount, but chose in some cases to take less than the full amount of its eligible wire transfer.

A: That's correct.

In October 2002, Amedisys did not request funding for the first three consecutive weeks. Greg Brown, CFO of Amedisys, explained why Amedisys did not make any funding request for the first three weeks of October 2002:

Q: [F]or the three weeks in October, you were submitting receivables, but you were not requesting funding, correct?

A: Correct.

Q: And you were doing that, I believe you testified, because you were in anticipation of this acquisition that you were planning; is that correct?

A: I think I testified that there were two reasons why we had continued to keep the facility going: one was that we had an acquisition that we were anticipating doing later on in 2002, and, secondly we kept the program going because to terminate the program meant that we would have to repay the note to NPF Capital in entirety on the same day.

This testimony of the Amedisys' CFO is not consistent with the arguments of Amedisys that NCFE did not and could not buy Amedisys' accounts receivable after April, 2002. The testimony of Amedisys' CFO clearly demonstrates that accounts receivable were submitted and that it was Amedisys that did not seek immediate funding. Although Amedisys describes the $7.3 million in accounts receivable as a "deposit" and argues that it was "comfortable with the situation because it believed it could get its deposit whenever it wanted (historically)," that argument does not conform to the reality of the situation in September and October of 2002. If the accounts receivable were just deposits, it cannot be explained why Amedisys was in a net debit position with respect to NCFE in September, 2002, when Amedisys actually owed NPF VI some $1.6 million. Further, Amedisys' argument that NCFE purchased no additional receivables it collected on behalf of Amedisys after September 30, 2002, is also not convincing because Amedisys still owed NPF VI about $1.6 million at the end of September under the Sale Agreement.

Email communications between Amedisys and the NCFE Defendants during November, 2002 is also instructive on the argument whether the accounts receivable were purchased by NPF VI and whether the receivables that were transferred were "purchase" receivables. In an email dated November 1, 2002, Mr. Browne, the CFO of Amedisys, wrote to Mr. Faulkenberry that "NPF VI has purchased receivables from Amedisys, collected funds on those accounts, and *not* remitted those funds to Amedisys." Another email from Mr. Browne to Huntington Bank states, "any continued transfer of funds to any account of or associated with NPF VI will materially damage Amedisys, Inc., and could be considered a fraudulent conveyance, since purchased receivables have not been paid for." In the first email communication from Mr. Browne to Mr. Faulkenberry, Mr. Browne states that the receivables were "purchased." In the second email,

Mr. Browne's words indicate that the receivables submitted from Amedisys to NPF VI were "purchased receivables." Although the email communications originating from Mr. Browne are a colloquial attempt to recover funds, the language is certainly instructive. The language in the email from Mr. Browne to Mr. Faulkenberry suggest that Mr. Browne had the understanding that NPF VI had purchased the receivables but that Amedisys had not received funds for the purchase. In the second email, Mr. Browne stated in unambiguous terms that the receivables transferred and unpaid for were of the sort normally labeled "purchased."

These communications, along with the deposition testimony of the CFO of Amedisys, refute Amedisys' argument that the funds were not purchased per the Sale Agreement and that even if they were purchased, the receivables were of the sort that came into the category of "non-purchased accounts receivable." Although the Section 2.2 of the Sale Agreement does provide that ownership of the purchased receivables will be vested in the purchaser following payment of the purchase price, the parties' conduct had long deviated from this rule. It is clear that after April, 2002, the parties had a slightly different relationship from that contemplated in the Sale Agreement. Because of the vagaries of its business, Amedisys asked and received funding in a manner different from that in the Sale Agreement. Throughout the Summer and Autumn of 2002, Amedisys' position vis-a-vis NPF VI seesawed between a net debit and credit position. Certainly, this wasn't the mode of functioning prescribed by the Sale Agreement.

Considering the facts set forth above, the Court concludes that NPF VI had indeed purchased the accounts receivable and that the said receivables were of the "purchase" type defined in the Sale Agreement. Amedisys, however, argues that even if there was a deviation from the Sale Agreement, such deviation is not valid because the Sale Agreement specifically prohibited any sort of an oral modification or waiver. The Court will first deal with whether there indeed was a waiver in this case and then address whether modifications and waivers were allowed.

The first question that the Court must resolve is whether Amedisys' action not to request funding in October, 2002 constitutes a waiver of its rights it was entitled to under the Sale Agreement.

 In *White Co. v. Canton Transportation Co.*, 131 Ohio St. 190, 2 N.E.2d 501 (1936), the Ohio Supreme Court has defined "waiver" as follows:

> A waiver is a voluntary relinquishment of a known right. It may be made by express words or by conduct which renders impossible a performance by the other party, or which seems to dispense with complete performance at a time when the obligor might fully perform. Mere silence will not amount to waiver where one is not bound to speak.

131 Ohio St. at 198, 2 N.E.2d 501 (citing *List & Son Co. v. Chase*, 80 Ohio St. 42, 49, 88 N.E. 120 (1909)). *See also Weaver v. Weaver*, 36 Ohio App.3d 210, 212, 522 N.E.2d 574 (Ohio App. 4th Dist.1987) ("The essential elements of a waiver are an existing right, benefit, or advantage; knowledge, actual or constructive, of the existence of such right, benefit, or advantage; and an actual intention to relinquish it or an adequate substitute for such intention."). The defendant must prove the waiver "by the greater weight of the evidence, but in so doing he was required to prove a clear, unequivocal, decisive act of the party against whom the waiver was asserted, showing such a purpose or acts amounting to an estoppel on the latter's part." *Id.*

In the present case, Amedisys, although well aware of its rights, voluntarily and intentionally requested NCFE to withhold payments in anticipation of an acquisition. Greg Browne, the CFO of Amedisys stated, "I believe that every week a request was made prior to October 2002, when, for three consecutive weeks, no request was made." Greg Browne also testified as follows:

Q: [F]or the three weeks in October, you were submitting receivables, but you were not requesting funding, correct?

A: Correct.

Q: And you were doing that, I believe you testified, because you were in anticipation of this acquisition that you were planning; is that correct?

A: I think I testified that there were two reasons why we had continued to keep the facility going: one was that we had an acquisition that we were anticipating doing later on in 2002, and, secondly we kept the program going because to terminate the program meant that we would have to repay the note to NPF Capital in entirety on the same day.

Pursuant to this evidence presented into the record, the Court finds that Amedisys waived its right to receive payments on the purchase dates by voluntarily requesting NCFE to withhold payments for its own benefit. Amedisys is thus estopped from asserting that it did not sell its accounts receivable automatically submitted according to the Sale Agreement in October, 2002. Further, because Amedisys waived its right to receive payments entitled under Section 2.2 of the Sale Agreement, the Court finds that the ownership of accounts receivable was transferred to NPF VI at the moment Amedisys voluntarily requested NCFE to withhold payments later in 2002.

Amedisys, however, contends that the Sale Agreement cannot be modified unless it is signed by both parties in writing pursuant to § 10.6 of the Sale Agreement. It is also contended that the same section further prohibits waiver of the Sale Agreement unless the same conditions are satisfied. Section 10.6 states:

No modification, amendment or waiver of, or with respect to, any provision of this Agreement, and all other agreements, instruments and documents delivered pursuant hereto or thereto, nor consent to any departure by the Seller or the Subservicer from any of the terms or conditions thereof, shall be effective unless it shall be in writing and signed by each of the parties hereto. Any waiver or consent shall be effective only in the specific instance and for the purpose for which given....

The Sale Agreement is silent as to what exactly constitutes "writing" or "signature." The Ohio Revised Code defines "signed" as including "any symbol executed or adopted by a party with present intention to authenticate a writing." O.R.C. § 1301.01(MM). "Written" or "writing" is defined as including "printing, typewriting, or any other intentional reduction to tangible form." O.R.C. § 1301.01(TT). Case authority indicates that an email and like communication generally satisfies the requirement for signature and writing. *See, e.g., Central Illinois Light Co. v. Consolidation Coal Co.,* 235 F.Supp.2d 916, 918 (C.D.Ill.2002)("[i]nternal documents, invoices and emails can be used to satisfy the Illinois UCC statute of frauds"); *Commonwealth Aluminum Corp. v. Stanley Metal Ass'n,* 186 F.Supp.2d 770, 774 (W.D.Ky.2001) (holding that an email satisfied the UCC requirement for writing under the statute of frauds).

In this case, Amedisys sent a weekly email to NCFE to notify how much funding Amedisys wanted for that week. Further, Amedisys was provided, on a weekly basis, with reconciliation reports showing its requested funding amounts. The Court finds that these weekly emails and reconciliation reports satisfy the writing and signature requirements of the Sale Agreement. Further, the Court finds that these emails modified the Sale Agreement where Amedisys received funds from the sale of the accounts receivable on its terms when it so directed the NCFE Defendants instead of receiving funds automatically upon the sale of the accounts receivable.

Holding that the NCFE Defendants did indeed purchase Amedisys' eligible accounts receivable, the Court now will review the counts of Amedisys' Second Amended Complaint to determine whether it can withstand summary judgment scrutiny.

### 1. Count I.

Count I seeks a declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, et seq. Amedisys specifically asks for the following relief:

> Plaintiffs are entitled to a declaratory judgment from this Court declaring the parties' respective rights and obligations, including, inter alia, the parties' respective rights and obligations under the Sale Agreement, the Master Indenture and related documents and the parties' respective rights and obligations in connection with the funds . . .

> Plaintiffs are also entitled to a declaration that the Sale Agreements, the Master Indenture and related documents together form one contractual relationship between the NCFE Entities, Amedisys and JP Morgan.

> In the alternative, Plaintiffs are entitled to a declaration that they are third party beneficiaries of the Master Indenture and, as such, JP Morgan owes fiduciary obligations to Amedisys.

Because the Court found that the ownership of accounts receivable in dispute was transferred to NCFE at the moment Amedisys requested NCFE to withhold payments and NCFE consented, we hold that Amedisys has no rights to the accounts receivable.

The Court also cannot hold that there existed a fiduciary relationship between Amedisys and JP Morgan. "A 'fiduciary relationship' is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." *Stone v. Davis*, 66 Ohio St.2d 74, 78, 419 N.E.2d 1094 (1981). The fact of the relationship must be proved. *In re Termination of Employment of Pratt*, 40 Ohio St.2d 107, 321 N.E.2d 603 (1974). A fiduciary duty need not arise out of contract but may arise out an informal relationship where both parties understand that a special trust or confidence has been reposed. *Blon v. Bank One, Akron, N.A.*, 35 Ohio St.3d 98, 519 N.E.2d 363 (1988).

In the present case, Amedisys is not a party to the Indenture Agreement and JP Morgan is not a party to the Sale Agreement. Although the Indenture Agreement incorporated the terms and conditions of the Sale Agreement by reference (i.e., sections 6.05, 6.02, and 5.11 of the Indenture Agreement), the Court does not find that the Sale Agreement, the Indenture Agreement, and related documents represented one contractual relationship among Amedisys, the NCFE Entities, and JP Morgan. The Court agrees with Judge Graham's finding that "the plaintiffs [Amedisys] had a contractual relationship with the NCFE

Entities, but no contractual relationship with Chase Manhattan." *Amedisys v. JP Morgan Chase Manhattan Bank,* Case No. C2–02–1105 (E.D.Ohio November 13, 2002). On the basis of a lack of a contractual privity, the Court cannot hold that JP Morgan had a fiduciary duty to Amedisys. Further, outside of a common relationship with the NCFE Defendants, Amedisys and JP Morgan did not have any other sort of a relationship that can be evinced from the evidence. There was no informal relationship where both Amedisys and JP Morgan understood that a special trust or confidence has been reposed. Thus, the Court cannot find that JP Morgan owed a fiduciary duty to Amedisys.

Amedisys also argues that it was the third party beneficiary of the Indenture Agreement. However, because Section 10.10 of the Indenture Agreement specifically precludes Amedisys from claiming that it was the third party beneficiary under the Indenture Agreement, Amedisys' claim is moot. *See Holliday v. Marion Twp. Bd. of Trustees,* 2000 WL 1420281, *2 (Ohio App. 3rd Dist.2000) ("[i]n order for the appellee to be a third-party beneficiary of the contract with the ability to enforce the contract between the Board and the union, he must be an intended beneficiary rather than an indirect or incidental beneficiary.").

Pursuant to our determination that the NCFE Defendants did actually purchase Amedisys' accounts receivable, Amedisys is not entitled to a declaratory judgment providing that it has rights to the accounts receivable funds. Amedisys only has a general contractual claim for nonpayment. Further, Amedisys is not entitled to a declaratory judgment that the agreements and related documents create one contractual relationship among the parties. The Court also is precluded by the Indenture Agreement from holding that Amedisys is

a third party beneficiary of the Indenture Agreement and JP Morgan violated fiduciary obligations owing to Amedisys. The Defendants' motions for summary judgment as to Count I must be granted as to all Defendants.

### 2. Count II.

Count II seeks against JP Morgan a declaratory judgment that JP Morgan owed a fiduciary duty to Amedisys as an escrow agent. The Court finds that because § 10.10 of the Indenture Agreement apparently precludes Amedisys from claiming that the Indenture Agreement created an escrow agreement between Amedisys and JP Morgan, no fiduciary duty arose. Accordingly, the motion for summary judgment must be granted to JP Morgan on Count II.

### 3. Count III.

Count III alleges that the $7.3 million has been subject to an express trust which was established under § 6.1 of the Sale Agreement. The Sixth Circuit, applying Ohio law in a bankruptcy case, has held that "[t]o create an express trust in Ohio, there must be a manifestation of intent to create a trust, there must be created a trust corpus, and there must be a fiduciary relationship between the trustee and the beneficiary." *In re Construction Alternatives, Inc.,* 2 F.3d 670, 677 (6th Cir.1993) (citing *Brown v. Concerned Citizens for Sickle Cell Anemia, Inc.,* 56 Ohio St.2d 85, 382 N.E.2d 1155 (1978)). Amedisys has not offered evidence showing that there was a manifestation by Amedisys and NCFE to create an express trust. Rather, all of the evidence shows that the Sale Agreement and the modifications created a sale where Amedisys sold its accounts receivable to NPF VI for cash.

Amedisys argues that the 7.3 million constitutes a *trust res*. However, this

amount was calculated and ascertained through the buyout reconciliation after the requests for funding were dishonored by JP Morgan. There are no facts adduced which would show that NCFE agreed to assume a fiduciary duty in relation to the $7.3 million. In this regard, the following explanation, in a recent Ohio case, on the difference between a trust and a debt is enlightening:

It is a well-settled principle of law in this and other jurisdictions that if one person pays money to another it depends upon the manifested intention of the parties whether a trust or a debt is created. If the intention is that the money shall be kept or used as a separate fund for the benefit of the payor, or a third person, a trust is created. If the intention is that the person receiving the money shall have the unrestricted use thereof, being liable to pay a similar amount whether with or without interest to the payor or to a third person, a debt is created. The intention of the parties will be ascertained by a consideration of their words and conduct in light of surrounding circumstances.

*Ohio Farmers Ins. Co. v. Hughes–Bechtol, Inc.,* 249 B.R. 735, 740 (S.D.Ohio 1998) (citing *Federal Ins. Co. v. Fifth Third Bank,* 867 F.2d 330, 333 (6th Cir.1989)). Because here just a debtor and creditor relationship was established between Amedisys and NPF VI under the Sale Agreement no express trust existed. The motion for summary judgment must be granted to the NCFE Defendants on Count III.

4. Count IV.

 Count IV asks the Court to impose a constructive trust on the $7.3 million because this amount constitutes unjust enrichment to NPF VI. The Ohio Supreme Court has defined a constructive trust as follows:

A trust by operation of law which arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. It is raised by equity to satisfy the demands of justice.

*Ferguson v. Owens,* 9 Ohio St.3d 223, 225, 459 N.E.2d 1293 (1984). Under Ohio law, constructive trusts are designed to prevent fraud or other inequity, and they create an equitable title in some other person, irrespective of intention of parties. *See NPF IV v. Transitional Health Services,* 922 F.Supp. 77 (S.D.Ohio 1996). The Court may impose a constructive trust "where there is a duty to convey property because it was acquired through fraud, duress, undue influence, mistake, breach of a fiduciary obligation, or abuse of a confidential relationship." *Id.* at 84.

 Because the Court concludes that the relationship between Amedisys and the NCFE Defendants was a debtor and creditor relationship, and none of the other badges required to impose a constructive trust are apparent in this case, the Court cannot impose a constructive trust retroactively at the time of the transfer of the accounts receivable in dispute here. Although Amedisys and the NCFE Defendants had a debtor and creditor relationship, that without more is not enough to deem that they had a fiduciary relationship needed for the application of a constructive trust. *See Umbaugh Pole Bldg. v. Scott,* 58 Ohio St.2d 282, 390 N.E.2d 320 (1979)(the relationship between a debtor and a creditor is not a fiduciary one).

Further, Ohio law does not allow the imposition of a constructive trust for mere breach of contract, as is the case here. *See, Poss v. Morris,* 260 F.3d 654, 668 (6th Cir.2001). ("breach of contract or failure to pay a debt without more cannot give rise to a constructive trust.") (citing *Croston v. Croston,* 18 Ohio App.2d 159, 164, 247 N.E.2d 765 (1969)). We find that the badges of impropriety needed to impose a constructive trust are not present in this case. The Court thus grants summary judgment on Count IV.

■ Even if some of the badges of impropriety were present and even if the Court had made a finding that the Defendants were mere escrow agents, Amedisys still probably would not be able to make a case for the imposition of constructive trust. Not only would Amedisys have to trace the funds it states are its own, but Amedisys would also have to satisfy the lowest intermediate balance rule. However, before the Court addresses this issue, it is very helpful to delineate how funds were transferred between various accounts under the Sale Agreement and the Indenture Agreement. As described in Section 2.3 of the Sale Agreement, Amedisys maintained Lockbox Accounts (at Huntington Bank) in the name of itself into which all payments from payors regarding purchased receivables were deposited. Everyday these Lockbox Accounts were zero balanced and the funds in those accounts were transferred into NPF VI Collection Account at JP Morgan. All payments from health care receivables sold by various healthcare providers to NPF VI, including Amedisys, were commingled in the NPF VI Collection Account. This account at JP Morgan was itself also "almost daily" zero balanced.

To prove a case for the imposition of a constructive trust, Amedisys is required to prove that it traced and found at the various accounts at JP Morgan comprising the $7.3 million to which it claims it is entitled. The Sixth Circuit Court of Appeals states this rule as follows:

> Once the trust relationship has been established, one claiming as a cestui que trust thereunder must identify the trust fund or property in the estate, and, if such fund or property has been mingled with the general property of the debtor, sufficiently trace the trust property. If the trust fund or property cannot be identified in its original or substituted form, the cestui becomes merely a general creditor of the estate.

*First Federal of Michigan v. Barrow,* 878 F.2d 912, 915 (6th Cir.1989) (citing 4 Collier on Bankruptcy 541.13, at 541–78–541–79 (15th Ed.1988)). *See also Staley v. Kreinbihl,* 152 Ohio St. 315, 89 N.E.2d 593 (1949) ("It is usually held that commingled trust money must be traced into some specific fund, and that it is not sufficient to show that it is somewhere among the general assets of the trustee, or that it went into any one of several accounts grouped together under a single general classification.") (citing 65 C.J.S. 972 § 899).

In the present case, it is highly unlikely that Amedisys would be able to trace and identify a specific account into which the disputed $7.3 million was deposited. Amedisys just argues that "tracing is possible." However, because the $7.3 million was commingled with other unidentifiable funds, Amedisys is required to "sufficiently trace" the disputed money among the various accounts given the somewhat higher standard under *Barrow* and *Staley*.

■ Amedisys, however, claims that the burden of tracing shifts to the wrongdoer where the trustee commingles the trust fund with its private fund under the law of Ohio. The Sixth circuit rejected this argument in *Barrow* and held that, "as a general rule, any party seeking to impress

a trust upon funds for purposes of exemption from a bankrupt estate must identify the trust fund in its original or substituted form." *Barrow*, 878 F.2d at 915 (citing *Danning v. Bozek*, 836 F.2d 1214 (9th Cir.); *Elliott v. Bumb*, 356 F.2d 749 (9th Cir.)). *See also Staley*, 152 Ohio St. at 319, 89 N.E.2d 593 ("Plaintiff [who is asserting a constructive trust] has the burden of proof.").

Even assuming Amedisys can meet the tracing requirement, it is further required that it must satisfy the "lowest intermediate balance test" because the NPF VI Collection Account was zero balanced "almost daily." The Six Circuit has identified the test as follows:

> The situation frequently occurs where trust funds have been traced into a general bank account of the debtor. The following general principles have been applied. The bankruptcy court will follow the trust fund and decree restitution where the amount of the deposit has at all times since the intermingling of funds equaled or exceeded the amount of the trust fund. But where, after the appropriation and mingling, all of the moneys are withdrawn, the equity of the cestui is lost, although moneys from other sources are subsequently deposited in the same account. In the intermediate case where the account is reduced to a smaller sum than the trust fund, the latter must be regarded as dissipated, except as to the balance, and funds subsequently added from other sources cannot be subject to the equitable claim of the cestui que trust. If new money is deposited before the balance is reduced, the reduction should be considered to be from the new money and not from the monies held in trust. This analysis may be referred to as the lowest intermediate balance test.

*Barrow*, 878 F.2d at 916 (citing 4 Collier on Bankruptcy 541.13, at 541–79—541–80 (15th ed.1988)). *See also* Restatement (Second) of Trusts § 202, Comment j (1959) ("If after the deposit of trust funds in the account the deposit was wholly exhausted by withdrawals before subsequent deposits of the trustee's individual funds were made, the beneficiary's lien upon the deposit is extinguished, and if he is unable to trace the money withdrawn, he is relegated to a mere personal claim against the trustee, and is entitled to no priority over other creditors of the trustee.").

In the present case, Amedisys claims that the Collection account, the Purchase Account, and the three Reserve Accounts should be considered collectively to measure the lowest intermediate balance of its deposit. The Court does not make a ruling on this issue. However, in order to prevail under the constructive trust theory, Amedisys is required to prove that "the intermingling of funds equaled or exceeded the amount of the trust fund" (i.e., 7.3 million) pursuant to the lowest intermediate balance test. It does not seem likely that Amedisys can prove such a point. The NPF VI Collection Account was commingled with other funds and was zeroed "almost daily." In summary, even if the Court were to hold that the conditions necessary were present to impose a constructive trust, it is highly unlikely that Amedisys could satisfactorily trace the funds it is seeking.

5. Count V.

■■■■■ Count V alleges that the $7.3 million is subject to a resulting trust. "A resulting trust, unlike a constructive trust, seeks to carry out a donative intent rather than to thwart an unjust scheme. [citation omitted] The general rule is that 'where a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the

person by whom the purchase price is paid.'" *United States v. Marx*, 844 F.2d 1303, 1309 (7th Cir.1988) (citing Restatement (Second) of Trusts § 440 (1959)). This sort of a trust is "one based on the intention of the parties, and has been defined as 'one which the court of equity declares to exist where the legal estate in property is transferred or acquired by one under facts and circumstances which indicate that the beneficial interest is not intended to be enjoyed by the holder of the legal title.'" *NPF IV, Inc.*, 922 F.Supp. at 83 (citing *First Nat'l Bank of Cincinnati v. Tenney*, 165 Ohio St. 513, 515–516, 138 N.E.2d 15 (1956)). The proof required to impose a resulting trust must be strong, clear, and convincing. *Taylor v. Rupp*, 133 F.3d 1336 (10th Cir.1998). It is the intention at the time of the transfer and not at some subsequent time which determines if a resulting trust arises. *Id.*

Ohio law imposes resulting trusts in three occasions: "1) where an express trust fails in whole or in part; 2) where an express trust is performed without exhausting the trust estate; and 3) purchase-money trust." *NPF IV, Inc.*, 922 F.Supp. at 83 (citing *John Deere Indus. Equip. Co. v. Gentile*, 9 Ohio App.3d 251, 459 N.E.2d 611 (1983)). Because, as mentioned before, the parties at the time of the transfer of the accounts receivable did not have any intention of creating any kind of a trust, a resulting trust cannot be imposed. Accordingly, the motion for summary judgment must be granted as to all defendants on Count V.

### 6. Count VI.

Count VI claims that at least $7,337,569 must be turned over to Amedisys pursuant to 11 U.S.C. § 542. Amedisys specifically states, "Plaintiffs are entitled to an order directing the immediate turnover of their property." Amedisys does not state whether Count VI is based on Section 542 of the Bankruptcy Code or whether "turnover" is used in its more colloquial sense. In any regard, the Court grants summary judgment to the Defendants on this count. First, the Court has determined that the NCFE Defendants bought Amedisys' accounts receivable thus the $7.3 million are not Amedisys' funds. Second, if the Count is based on Section 542, then Amedisys is caught in a catch 22 because Section 542 applies to the property of the estate and Amedisys is seeking turnover of its own belongings. *See In re Matheney*, 138 B.R. 541 (Bankr.S.D.Ohio 1992) ("An action is properly characterized as one for turnover where the trustee or debtor in possession is seeking to obtain property *of* the debtor, as opposed to seeking property owed to the debtor."). Count VI is summarily dismissed.

### 7. Count VII.

Count VII claims breach of the Sale agreement against the NCFE Entities. Amedisys specifically states that "[t]he NCFE Entities have specifically breached the Sale Agreements by failing, *inter alia*, to timely and properly return funds to Amedisys, failing to properly maintain the Lockbox Accounts, failing to properly maintain a detailed accounting record of all deposits and withdrawals from the Reserve Accounts, improperly allocating, distributing, and commingling such funds." Based on this breach, Amedisys asks for "an amount in excess of $75,000.00, exclusive of interest and costs, together with interest thereon, attorneys fees, and the costs of this action." Based on the evidence at this time, the Court cannot make a finding that the NCFE Defendants did not engage in acts such as commingling. In fact, there might be evidence that the NCFE Defendants did in-

deed engage in such acts.[7] Summary judgment thus cannot be granted to the NCFE Defendants on this Count.[8]

### 8. Count VIII.

Count VIII seeks specific performance of the Sale Agreement against the NCFE Entities. However, this claim is moot because of the confirmation of the NCFE Defendants' Fourth Amended Plan of Liquidation. Summary judgment must be granted to the NCFE Defendants on Count VIII.

### 9. Count IX.

Count IX alleges breach of fiduciary duty against the NCFE Entities. For reasons previously explained, the Court finds that the NCFE Entities owed no fiduciary duty under the Sale Agreement. Summary judgment must be granted to the NCFE Entities on Count IX.

### 10. Count X.

▇▇▇ Count X alleges fraud against the NCFE Entities. It is unclear whether Amedisys is alleging fraud under Section 523(a)(2) of the Bankruptcy Code or alleging common-law fraud. It is clear that it does not matter. The Ohio Supreme Court has set forth the elements of fraud as: (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6)

a resulting injury proximately caused by the reliance. *See Cohen v. Lamko, Inc.,* 10 Ohio St.3d 167, 169, 462 N.E.2d 407 (1984) (quoting *Friedland v. Lipman,* 68 Ohio App.2d 255, 429 N.E.2d 456 (Ohio App. 8th Dist.1980), paragraph one of the syllabus). In the Sixth Circuit, § 523(a)(2) fraud involves four elements: 1) material misrepresentation that was false or made with gross recklessness as to its truth, 2) intent to deceive, 3) creditor justifiably relied on false representation, and 4) proximate cause. *Rembert v. AT & T Universal Card Services, Inc.,* 141 F.3d 277, 280 (6th Cir.1998) (citing *Longo v. McLaren (In re McLaren),* 3 F.3d 958, 961 (6th Cir.1993)). Amedisys argues that the NCFE entities repeatedly made intentional misrepresentations regarding the funding and return of the funds. In the present case, NCFE instructed JP Morgan to wire the requested amount, but JP Morgan did not honor the instruction because bondholders under the Indenture Agreement had already declared an event of amortization. NCFE's promise to send the requested funding amount cannot constitute a misrepresentation because, at that time, NCFE actually instructed JP Morgan to release the funds. *See Greenstreet v. Bickers,* 97 Ohio App.3d 610, 614, 647 N.E.2d 214 (Ct.App. 8th Dist. 1994) ("[A] promise to perform in the future is not capable of being a representation that is the basis for fraud absent a demonstration that at that time it was made, the promisor intended not to perform the promise."). Furthermore, Amedisys has not offered any evidence showing that it detrimentally relied on the promise because bondholders had already declared an event of default and thus Amedisys had

---

7. At the confirmation hearing on the Fourth Amended Plan of Liquidation, there was testimony of such facts. The Court takes judicial notice of such facts.

8. The Court does note that although summary judgment is not granted, the confirmation of the Fourth Amended Plan of Liquidation might implicate the ability of Amedisys to collect on this count.

 

been aware that the funding request might not be honored as promised. The motion for summary judgment must be granted to the NCFE Defendants on Count X. Neither under common law nor under Section 523, can a case for fraud be made.

11. Counts XI and XII.

Count XI seeks an accounting and Count XII seeks removal of NPFS as servicer under the Sale Agreement. These claims are moot because NCFE has already provided an accounting, and the trustee in bankruptcy has rejected the Sale Agreement. The summary judgment must be granted as to all defendants on Counts XI and XII.

12. Count XIII.

 Count XIII alleges conversion against the NCFE Defendants. The Ohio Supreme Court has defined conversion as "a wrongful exercise of dominion over property in exclusion of the right of the owner, or withholding it from his possession under a claim inconsistent with his rights." *Zacchini v. Scripps–Howard Broadcasting Co.*, 47 Ohio St.2d 224, 226, 351 N.E.2d 454 (1976), rev'd on other grounds, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977). While an action for conversion of money may be filed, it is well settled that the action will not lie "unless identification is possible and there is an obligation to deliver the specific money.", *NPF IV, Inc.*, 922 F.Supp. at 81 (citing *Lewis v. Fowler*, 479 So.2d 725 (Ala.1985)). As explained before, the NCFE Defendants purchased the eligible accounts receivable of Amedisys. They took legal title. The NCFE Defendants are granted summary judgment on this Count.

D. Conclusion

The NCFE Entities' and JP Morgan's Motion for Summary Judgment is GRANTED as follows:

1. Judgment is entered in favor of the NCFE Entities and against the Plaintiffs on Counts I, III, IV, V, VI, VIII, IX, X, XI, XII, and XIII of the Plaintiffs' Second Amended Complaint.

2. Judgment is entered in favor of JP Morgan and against the Plaintiffs on Counts I, II, IV, V, VI, XI, and XII of the Plaintiffs' Second Amended Complaint.

IT IS SO ORDERED.